**314 A.2d 627.**

STATE *vs.* ROGER A. NAULT.

FEBRUARY 13, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin and Kelleher, JJ.

KELLEHER, J. The defendant is an attorney. He was indicted on a charge that he embezzled funds belonging to a client. The defendant filed a plea of not guilty and a special plea of not guilty by reason of insanity.[1] A Superior Court jury returned a guilty verdict. The trial justice denied the defendant's motion for a new trial. The defendant is before us on a bill of exceptions. Hereinafter, we shall refer to the defendant by his last name.

Mr. and Mrs. Alfred Roy reside in Woonsocket. Sometime in early 1966, the Roys, who had just purchased a home,[2] discovered that the real estate taxes due the city

---

[1] In *State* v. *Cook*, 104 R. I. 442, 244 A.2d 833 (1968), we noted that there are variant shades of mental illness and that the appellation of insanity which encompasses the full spectrum of mental abnormalities does not necessarily connote incompetency to stand trial. The record presently before us is replete with references to Nault's "insanity." We think that in the interest of preciseness, it would be better that in cases such as Nault's the defense he espouses should be described as "not guilty by reason of lack of criminal responsibility due to a mental illness." Such a description would do more to place this type of defense in its proper focus.

[2] The Roys had purchased the property without benefit of a title search. The selling price was $1,600. When they finally redeemed their real estate, there was over $1,700 due the city.

had not been paid for many years. The Roys consulted with Nault. In time, arrangements were made whereby the Roys would pay $1,250 to the city and in return they would receive a deed of redemption. On August 3, 1967, the Roys delivered $1,250 in cash to Nault. Nault gave them a receipt and he assured his clients that he would deposit the funds in his checking account and thereupon issue his check to the tax collector.

Shortly after the beginning of the new year (1968), the Roys decided to build an addition to their home. Mr. Roy went to the building inspector's office. The building inspector's staff checked the Roys' status with the tax collector. The collector reported that the $1,250 had not been paid. The Roys sought out Nault. He insisted that his check had been mailed to the tax collector. It was assumed that the check had been lost in the mail. Subsequently it was shown that Nault had indeed misappropriated the Roys' money.

The real issue at trial was whether Nault was criminally responsible for his actions.

The record discloses that in February, 1968, the Woonsocket Probate Court appointed a conservator to take charge of Nault's affairs.[3] At that time Nault was a patient at an out-of-state sanitarium. The court was presented with a certificate signed by the sanitarium's clinical director. It stated that Nault was confined for a "nervous and mental condition." The director informed the court of

---

[3]When we were notified of the conservatorship, we invited the conservator to meet with us and inform us of any circumstances which might mitigate against a suspension order. An attorney representing the conservator appeared and informed us that the conservator had no objection to the proposed suspension. On February 28, 1969, an order was entered barring Nault from practicing law until further order of this court. In the order, we emphasized that the suspension was not to be considered as a disciplinary action but as part of our obligation to protect the public interest. *In re Nault,* 105 R. I. 780, 252 A.2d 140 (1969).

his belief of Nault's inability to "manage his property and business affairs in a rational manner." Nault spent five months at a sanitarium located in Massachusetts and then returned to Woonsocket. In March, 1969, Nault was brought before the District Court of the Twelfth Judicial District and committed to the state's Institute of Mental Health. Nault was released from the institute in February, 1970 to appear before the District Court for a probable cause hearing on a complaint charging him with the embezzlement of the Roys' money. Nault's attorney waived any hearing and he was adjudged probably guilty. He was returned to the Institute of Mental Health to await the determination of the grand jury. The indictment was returned on May 15.

In his voir dire instructions and his charge to the jury, the trial justice made it quite clear that Rhode Island adheres to the M'Naghten rule and that the accused, if seeking to be excused from his criminal actions, must show that at the time of the commission of the act he was laboring under such a defect of reason from a disease of the mind as not to know the nature and quality of his actions or as not to have known that what he was doing was wrong. In doing so, the trial justice followed the well-established rule first enunciated in *State* v. *Quigley,* 26 R. I. 263, 58 A. 905 (1904), and repeated several times since. He defined the defense of insanity in terms of capacity to understand the nature and quality of the act and a capacity to distinguish between right and wrong with respect to the act. Most of the exceptions which Nault now presses revolve in some fashion or another around the so-called right or wrong test.

The first exception deals with the trial justice's refusal to charge on the so-called Durham rule, so named because it was promulgated in *Durham* v. *United States,* 214 F.2d

862 (D.C. Cir. 1954).[4] *Durham* stands for the proposition that criminal conduct is excusable if it is the product of a mental disease. We have on past occasions expressed a willingness to reexamine the M'Naghten rule. *State* v. *Page,* 104 R. I. 323, 244 A.2d 258 (1968); *State* v. *Jefferds,* 91 R. I. 214, 162 A.2d 536 (1960). We acknowledge the great strides that have been made in the mental health field. However, we still await the testimony of competent and qualified witnesses that might establish the inadequacy and unreliability of the M'Naghten standard. At oral argument Nault's counsel acknowledged the absence of any evidence that would warrant a departure from the prevailing rule in this jurisdiction.[5]

The next exceptions concern the trial justice's refusal to allow defense counsel to interrogate prospective jurors about their feelings concerning people who are "mentally ill" and their legal responsibilities. The trial justice expressed his dissatisfaction with counsel's use of the term "mentally ill." Such a term, remarked the trial justice, did not properly describe the mental condition of one who sought to explain away his conduct which might otherwise

---

[4]The court that promulgated the Durham rule has discarded it. *United States* v. *Bramer,* 471 F.2d 969 (D.C. Cir. 1972). In its place, the court adopted the rule stated in §4.01(1) of the Model Penal Code of the American Law Institute which reads as follows:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform to the requirements of the law."

[5]The January, 1970 General Assembly passed an act creating a commission which was charged with the responsibility of studying and evaluating the "merit and reliability" of the various standards being used in determining the criminal responsibility of the mentally ill. The commission was given an appropriation of $10,000. It has not, as yet, issued its report.

For an up-to-date compilation showing the various courts or jurisdictions that adhere to or have deviated from the M'Naghten standard, reference is made to 45 A.L.R.2d 1447 (1956) and its later case supplement.

be punishable as a crime. Finally, the trial justice told counsel that in his voir dire he would explain to the jurors the applicable standards enumerated in *Quigley* and inquire of the jurors whether they would find Nault innocent if they were convinced of his inability either to discern the nature of his act or to distinguish between its rightness or wrongness. The scope of the examination of prospective jurors and their disqualification is a matter which lies within the sound discretion of the trial justice. *State* v. *Pella,* 101 R. I. 62, 220 A.2d 226 (1966); *State* v. *Greene,* 74 R. I. 437, 60 A.2d 711 (1948). The term "mental illness," standing alone, is, as the trial justice so stated, a word of many colors. There was no attempt whatever to enlighten the court on the virtues of the Durham rule. In these circumstances, we see no abuse of discretion.

During the trial, defense counsel sought to introduce into evidence the Institute of Mental Health's medical records that relate to Nault's stay at that facility. These attempts occurred during the time a state psychiatrist who had treated Nault was testifying. At one point the psychiatrist complained of the inadequate notice he had received about his court appearance and his consequent inability to find the time whereby he could review Nault's records. When the defense first moved for the admission of the records, the trial justice said he would defer any action because of the last-minute summoning of the psychiatrist. The trial justice called a recess. The jury left the courtroom and the defense moved that the records be admitted into evidence. The trial justice replied, "I'll defer on that." At no time thereafter did defense counsel object to the deferral or do anything that would precipitate a ruling which would be subject to appellate review. We also point out that at no time was any attempt made to qualify the records as being admissible in the light of the principles set forth in *State* v. *Guaraneri,* 59 R. I. 173, 194 A. 589

(1937); *see also State* v. *Jamgochian,* 109 R. I. 46, 280 A.2d 320 (1971). Furthermore, no effort was made to cull from the records material that might be objectionable on grounds of hearsay, conclusions or unsubstantiated opinions. *State* v. *McGregor,* 82 R. I. 437, 111 A.2d 231 (1955).

Nault's brother, Rene, was a witness. He is the conservator of Nault's estate. He described a series of incidents including mysterious fires in his brother's bedroom, an overdose of drugs by his brother, Nault's locking himself in his bedroom each and every evening during 1963, his being found unconscious in the lobby of a Providence hotel, and his disappearance from home. Despite having presented a rather detailed picture of life in the Nault homestead, Nault now argues that the trial justice unduly restricted his counsel's efforts to give the Nault family background and his relationship with his kin. We cannot agree.

Nault complains of six instances where the trial justice either sustained the state's objection to a question or granted its motion to strike a response. The trial justice's actions were based on the conclusionary or speculative, or the remote or indefinite nature of the inquiry or the reply. We see no error.

Nault's final exception is to the denial of his motion for a new trial. He insists that the trial justice "misconceived" material evidence concerning his "insanity" during 1967. In making this statement he relies upon the testimony of Dr. Laurence Senseman. At the time of trial Dr. Senseman was practicing psychiatry in California. In the 1960's he was connected with the Massachusetts sanitarium and he also practiced here in Rhode Island.

He first saw Nault in December, 1964. At that time, Dr. Senseman felt that Nault was depressed—he had lost not only the "joy of living," but also his interest in his work, his initiative and weight. The psychiatrist saw

Nault three times in 1964, three times in 1965 and again in January, 1968 when he was admitted to the sanitarium. At one point in his testimony, the witness seemingly described his patient's 1964 condition as a "severe depressive reaction"—"where a person breaks completely with reality." He also spoke with Nault in March, 1968 at the District Court in Woonsocket just prior to his commitment to the state hospital. Doctor Senseman testified that as a result of the District Court meeting he felt his former patient was "probably insane." His final examination came in 1969 when he visited the Institute of Mental Health and observed Nault.

The direct examination concluded as follows:

"Q Doctor, was the defendant on August 3, 1967 laboring under such a defective reason from disease of the mind as to not to know the nature and quality of acts he was doing or as not to know that what he was doing was wrong?

"A In my opinion, Your Honor, this man has been sick for a period of time and I believe that this mental illness that he had made him unable to determine and know the consequences of right and wrong at this particular date. However, I did not examine him on that date, but from 1964 when I first examined him and when I last saw him it's been a progressive illness. I don't know whether that is negative or positive in there.

"The Court: Read the question again.
(Question read)

"A Yes."

During cross-examination, Dr. Senseman acknowledged that Nault was aware of the consequences he faced for having taken the Roys' money. He did not treat or consult with his patient during 1967. He conceded that in 1967 Nault had conducted a rigorous political campaign as he sought the endorsement for the office of mayor. He failed to qualify for the run-off election by approximately 100

votes. His campaign expenses were $15,000, most of which was other people's money. The witness agreed that during most of the period in question, Nault had engaged in the active practice of law. He also taught at a junior college. At one time in 1969, the patient worked for a Boston department store helping its lawyers run down their delinquent debtors. Nault told the psychiatrist that he obtained the job because "he knew all the tricks."

In his charge, the trial justice made it clear to the jury that it need not be bound by the opinions expressed by any expert witness. In denying the new trial motion the trial justice referred to the law practice that was carried on by Nault, and to the testimony of the Roys, who had described their initial conference with Nault and their favorable impressions of his legal talent. The trial justice stressed the absence of any testimony showing that in 1967 Nault's mental condition was such that he had any complete break with reality. He pointed to Nault's busy law practice and his mayoralty campaign as evidence that he was in fact aware of the manifest illegality of his diverting the Roys' money to his own use.

Nault has failed to demonstrate that the trial justice misconceived or overlooked any material evidence or that the conclusion he reached was clearly wrong. *State* v. *Maloney,* 109 R. I. 166, 283 A.2d 34 (1971).

The defendant's appeal is denied and dismissed, and the case is remitted to the Superior Court for further proceedings.

Mr. Justice Doris did not participate.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *Edward E. Dillon, Jr.,* Special Asst. Attorney General, for plaintiff.

*Frank O. Lind, Jr., William G. Savastano,* for defendant.