**369 A.2d 652.**

Peter G. Seabra *et al. vs.* Puritan Life Insurance Company.

JANUARY 26, 1977.

Present: Bevilacqua, C.J., Joslin, Kelleher and Doris, JJ.

KELLEHER, J. The plaintiff, the named beneficiary of a life insurance policy issued by the defendant, sued to recover the policy's proceeds following the death of her hus-

band. The case was tried before a Superior Court jury, who in turn awarded the plaintiff the sum of $47,170. The defendant has appealed. Hereinafter we will refer to the plaintiff as Dolores, to her late husband as the insured or Dr. Seabra, and the defendant as Puritan.

On April 24, 1963, Puritan issued a 20-year decreasing term policy on the life of Dr. Seabra. Attached to the policy was a rider containing a so-called waiver of premiums agreement for which Dr. Seabra paid an additional charge. The policy called for a total annual premium of $480, which was to be paid in quarterly installments. If a payment was not made on its due date or within the policy's 31-day grace period, the policy would become void. However, the policy could be reinstated upon the insured's written request, the payment of all past-due premiums plus interest, and the furnishing of satisfactory evidence that the insured was in good health.

Unfortunately, the quarterly payment due April 24, 1966, was not paid by that date or within the grace period. However, in early August Puritan received from Dr. Seabra a check dated July 30, 1966, for $240, which Puritan cashed. Later, on August 3, 1966, Puritan mailed Dr. Seabra a form which, when completed, would attest to the insured's good health and told him that the form must be completed and returned to Puritan. After a month went by with no response, Puritan sent a second letter and a duplicate form to Dr. Seabra. It again asked its insured to complete the form and return it. This letter, which was dated September 2, 1966, closed with the warning: "If we do not hear from you by October 3rd, the amount of $240.00 will be returned to you and the policy cancelled." Doctor Seabra did not live to bear the brunt of that admonition. On September 4, 1966, he died, and this litigation ultimately ensued.

At trial an abundance of evidence was adduced on two

basic questions. The first was whether Puritan had by its actions reinstated the policy during the summer of 1966. The second issue was whether the waiver of premiums rider had become operative, thereby preserving Dolores' right to the policy's proceeds. Dolores' suit was based on two theories: either the life policy, having lapsed, had been reinstated in August or there was no lapse because Puritan was bound by the waiver of premiums clause.

In its appeal Puritan claims that the trial justice should have granted its motions for a directed verdict and a new trial. It also contends that the trial justice erred in that portion of his jury instructions which related to the insured's failure to comply with the notice and proof of disability called for in the premium-waiver portion of his policy.

We will first concern ourselves with the waiver of premiums portion of the policy and the part it played in this litigation. In pertinent part, the agreement provides that upon the insurer's receipt of "due proof" that an insured has become "totally disabled," Puritan will waive the payment of any premiums that are due after the commencement of and during the continuance of the insured's total permanent disability. The agreement goes on to define "total disability" and then delineates a timetable for the providing of a written notice of claim and proof of total disability, including a stipulation that claim and proof be given during the insured's lifetime and the period he was disabled. The notice and proof portions of this proviso also provide that the failure to comply with the timetable will be overlooked upon a showing that the requisite notice and proof were given "as soon as was reasonably possible." The trial justice, after discussing the rider's notice and proof requirements, told the jury that "an insured may be excused from notice and proof of disability if mentally incapacitated." The trial justice then expounded on this

proposition. It is obvious from the trial justice's instructions that he assumed that an insured's mental incapacity would excuse the giving of the necessary notice and proof. However, so far as we are concerned, this particular issue is one of first impression.

In *Wolf* v. *Prudential Ins. Co. of America,* 62 R.I. 270, 4 A.2d 897 (1939), we recognized that a properly phrased policy provision requiring proof of total and permanent disability could be a condition precedent to a successful suit on the policy.[1] However, there is a world of difference between Wolf's amputated finger and Dr. Seabra's mental acuity. There has been and continues to be a diversity of judicial opinion as to whether "insanity" or "mental incompetency" of the insured excuses the lack of or the delay in filing notice of proof of disability. See the cases collected in *Mutual Life Ins. Co.* v. *Johnson,* 293 U.S. 335, 55 S.Ct. 154, 79 L.Ed. 398 (1934). In an annotation in 142 A.L.R. 852, 853 (1943), appears the following statement:

> "There is a conflict of authority upon the question whether the insanity of the insured will excuse, the giving of notice of disability under life policies providing for disability benefits and (or) the waiver of premiums, although, at least numerically, there seem to be more cases in favor of, than there are opposed to, the view that insanity excuses notice of disability."

---

[1]Many courts have taken the position that notice and proof provisions which are similar to those framed by Puritan will, in the absence of unequivocal language, be construed so that the supplying of notice and proof are conditions subsequent to the fixing of liability so that the existence of the disability rather than the proof fixes the insurer's liability. *Simpson* v. *Jefferson Standard Life Ins. Co.,* 465 F.2d 1320 (6th Cir. 1972); *King* v. *Prudential Ins. Co. of America,* 359 Mass. 46, 267 N.E.2d 643 (1971); *Kampf* v. *Franklin Life Ins. Co.,* 33 N.J. 36, 161 A.2d 717 (1960). *See also* Annot., "Disability Insurance Or Provision: Clause Requiring Notice Of Claim Within Specified Time Or As Soon As Reasonably Possible, Or The Like," 17 A.L.R. 3d §4(c) 530, 546 (1968). However, there is no necessity that we resolve this particular issue here.

Appleman observes that the better rule holds that "insanity" excuses a failure to make proof of disability within the time prescribed but he "regrets" that a "* * * majority of cases * * * hold that the insured has an absolute duty to submit proofs which is not excused by his insanity." 15 Appleman, *Insurance Law and Practice* §8317 at 134-35 (1944).

To require a person who is described by some as being "insane" or "mentally incompetent" to do something that his disability prevents him from doing places that person in what some would refer to as a "catch-22" situation. Thus, it is that we agree with the proposition that it would be unreasonable to assume that an insane or mentally incompetent person could accurately assess the nature and degree of his ailment. *Magill* v. *Travelers Ins. Co.*, 133 F.2d 709 (8th Cir. 1943). The insured is not bound to give notice of his disability when he is unable to do so by reason of the very disability insured against. As the court observed in *Harris* v. *Pacific Mut. Life Ins. Co.*, 137 F.2d 272 (10th Cir. 1943), while the furnishing of due proof of disability is a condition precedent to the insurer's obligation to waive premiums, it was not the event insured against, and since the inability to furnish proof grew out of the risk insured against, denial of recovery would be tantamount to a forfeiture. Consequently, the trial justice was correct when he ruled that "mental incapacity" or "insanity" could excuse the insured's failure to comply with the notice and proof requirements of the waiver of premium portion of the policy.

The question then remains as to what degree of insanity will operate as an excuse. As judges, lawyers, experts and laymen know, "insanity" is not one but a myriad of illnesses. The various rules contending for preeminence in criminal law attest to that fact. *See State* v. *Nault*, 112 R.I. 687, 314 A.2d 627 (1974).

The trial justice in this case, however, employed a standard which we find eminently reasonable and accordingly adopt. The trial justice said: "[T]he impossibility of giving the notice required does not excuse giving the notice where it becomes possible to do so; and the insured will be excused only when he acts within a reasonable time after such disability is removed." The disability must render the insured unable to comply with the policy requirements. Mental impairment will not excuse delay unless it is not reasonably possible to give notice during the entire period specified. *See Jackson* v. *Kennesaw Life & Accident Ins. Co.,* 116 Ga.App. 107, 156 S.E.2d 470 (1967); *Magill* v. *Travelers Ins. Co., supra.* We realize that such disability may assume various forms. The insured's mental condition may render him incapable of knowing that he had a policy, that he was suffering from a mental derangement, or that he had to furnish proof of disability. *Magill* v. *Travelers Ins. Co., supra.* And we recognize further, as did the trial justice, that there may be periods of normalcy or sanity during which the insured can appreciate the nature of his illness and can be expected to provide the notice and proof. The rule that we adopt today is one of reason. It protects the insured in that limited situation where he is so mentally incapacitated as to be incapable of notifying his insurance company. Therefore, insofar as the trial justice assumed that an insured's mental incapacity would excuse notice of claim and proof of loss, we find no error.

In dealing with Puritan's objection to the denial of its motion for a directed verdict, we must look at the evidence in the same manner and fashion as the trial court, and we are bound by the same rules as govern it. The evidence must be viewed by us without weighing it or assessing the witnesses' credibility in the light most favorable to Dolores, and we must, as did the trial justice, draw therefrom only

those reasonable inferences which support the two theories upon which her suit was based. If there is a proper evidentiary basis to support her claim, the controversy must be resolved by the jury. *Fontaine* v. *Devonis,* 114 R.I. 541, 336 A.2d 847 (1975).

Viewing the evidence as it related to the reinstatement status of the policy, we find that Puritan cashed the insured's July 1966 check. The check bears a special endorsement. One of Puritan's corporate officers, the secretary, was a witness. He explained that after Dr. Seabra's check was cashed, the proceeds were placed in a "liability account" pending receipt of the proof of the insured's good health. This witness defended Puritan's cashing of its insured's check on the grounds that it was "poor cash control to leave checks lying around." He agreed that the check could have been returned or attached to a file pending the receipt of the good health certificate. When the secretary's attention was directed to Puritan's September 2 communiqué to Dr. Seabra where Puritan, in acknowledging receipt of the quarterly payments, told the insured that his policy would be cancelled unless the good health certificate was returned to the insurer by October 3rd, the witness attempted to explain this epistle by telling the jury that what it meant to say was that Puritan would close its file on the reinstatement application. However, the secretary agreed that the letter did not say what he said it should have said. Literal preciseness to one side, the jury could reasonably infer from the check cashing and Puritan's use of the word "cancelled" that Puritan's Policy Service Division was giving its policyholders service with a capital "S" and that Puritan's officialdom had decided to forego the evidence of Dr. Seabra's current insurability and ordered the reinstatement of the policy.

Secondly, of course, was the question of Dr. Seabra's mental competency, his failure to inform the insurer of

his disability, and the relationship of these two factors to Puritan's promise to waive the payment of the premiums. At the time of Dr. Seabra's death he was living apart from his family and had been since February 1966. Dolores had instituted proceedings in the Family Court for a legal separation and had requested a restraining order to prevent her husband from harming their children. The insured had had a history of emotional disorders for several years and from August of 1963 to July 1964 had been treated by a Providence psychiatrist for "a manic-depressive condition, which was periodically psychotic." He had abruptly terminated the therapy in 1964 against the psychiatrist's advice. Since that time his behavior had become progressively more "bizarre" and threatening to his children according to the testimony of his wife and daughter. Matters finally reached the point where Dolores sought help from the Family Court and Dr. Seabra moved from his home to his office, where he remained, except for periods of hospitalization, until his death some 7 months later.

Doctor Seabra was in and out of the hospital for a variety of complaints during the last year of his life. He suffered a severe lumbo-sacral strain in December 1965 which, according to the orthopedic surgeon who attended him, rendered him totally disabled and unfit for work. The condition remained unchanged up to and including March 17, 1966, the date on which he was last seen by the surgeon. In May he was admitted to Miriam Hospital under "extreme psychic stress" and suffering from edema. In June he was twice hospitalized at Memorial Hospital in Pawtucket for acute myocardial infarction, the first time being discharged at his own request against the advice of his physician. And in August he returned to Memorial Hospital for the last time, where he died.

The nursing notes and physicians' comments contained

in the hospital's records are replete with statements to the effect that the patient "rambles senselessly," was "confused," "very talkative," "irrational," that he made "strange requests" or was found "talking loudly out opened window" or "staring into space." In June of 1966 a psychiatrist who had treated the insured from August 1963 until July 1964 found Dr. Seabra to be "completely disabled." The hospital records indicate that the psychiatrist reported that his former patient had a "[l]ong history of manic-depressive behavior" and "needs prolonged psychiatric care." This specialist described Dr. Seabra's behavior on the day of the examination as being very disoriented, confused, and incoherent. He told the jury that the insured was "incompetent to handle his affairs," a condition which, according to the psychiatrist, had been present at least 6 months[2] earlier and which would continue for a very long period of time. The psychiatrist based his opinion upon the severity of the psychosis which he observed.

From the portions of the record to which we have just alluded, it is clear that there was ample evidence from which the jury could conclude that Dr. Seabra was totally and permanently disabled at the time his April premium payment was due and that the length of this disability also served as an excuse for his failure to give notice and proof of this condition. Nevertheless, Puritan argues that Dolores may not take advantage of her husband's disability because of her utter failure to give Puritan notice and proof within a reasonable time after his death.

---

[2]The policy provides that a total disability of 6 consecutive months will be presumed to be permanent. Most courts, when construing such a provision where a death has occurred before the presumptive period has run, have allowed recovery because death quite understandably is considered as the most total and permanent of all disabilities. 15 Appleman, *Insurance Law and Practice* §8307 at 104 (1944).

We have no quarrel with Puritan's proposition that a beneficiary's right to insurance proceeds is subject to all the provisions and limitations of the policy. *See* 2 Williston, *Contracts* §369 at 908 (Jaeger 3d ed. 1959). As noted earlier, written notice is expressly required "during the lifetime of the Insured and during the continuance of total disability." There is another stipulation which requires that the notice be given within 1 year of the due date of the earliest premium in default, plus the escape hatch, which allows late proof upon a showing that the evidence of loss was given "as soon as was reasonably possible." In reading the policy, it is obvious that one of those who is expected to give the desired notice and proof is the insured, but in the case at bar the evidence presented by Dolores and her witnesses warrants the inference that it was impossible for Dr. Seabra to do what might be expected of an insured who was possessed of all his faculties.

While Puritan's policy makes it clear that the insurer expects proof by the insured during his lifetime and within a year of the due date of the defaulted premium or in lieu thereof whenever the insurer is satisfied that notice was given with reasonable dispatch, there is a complete absence of any clear language in the policy from which it might be said that it was the duty of the beneficiary to come forward with notice and proof if the insured was unable to do so. If Puritan had sought to impose such a burden either ante or post mortem upon a beneficiary, the least it could have done was to say so. *Bell* v. *Acacia Mut. Life Ins. Co.*, 204 La. 1005, 1018, 16 So.2d 821, 825 (1944). Nowhere does the policy suggest that the beneficiary must give notice if the insured is excused therefrom, and we will not imply such

a requirement. Beneficiaries may be wholly unaware of the terms of a contract[3] made by the insured.

The record before us indicates that 3 days following Dr. Seabra's decease an attorney representing Dolores in her capacity as the mother of her minor son, James, wrote to Puritan and inquired about the policy. The letter told Puritan that its insured had died on September 4 "after a lengthy illness" and advice was sought as to the present status of the policy. Sometime in mid-October Puritan replied and informed the attorney that the policy had lapsed[4] and that there was $240 which was available for distribution to Dr. Seabra's estate.

In a situation which is almost identical to that presently before us, the court in *Kampf* v. *Franklin Life Ins. Co.*, 37 N.J. 593, 182 A.2d 855 (1962), ruled that the beneficiary was not required to give notice and proof in order to take advantage of the insurer's promise to waive premiums and observed that if a claim is made for the proceeds of the policy, the insurer knows that it must pay (1) if the premiums were paid or (2) if the

[3]Dolores testified that after Dr. Seabra's death some unknown individual cleared out her husband's office and that whatever records she uncovered were found in the back room of some bar. When Puritan's policy was first purchased in 1963, the beneficiaries were the three minor children, Mary, Peter, and James. There is no evidence that Dolores was aware at the time of her husband's death that in February 1964 he had made her the beneficiary. In fact, this suit was first commenced for the benefit of the children. After Puritan, in response to a pretrial motion, produced the policy it had issued to Dr. Seabra so that it could be inspected or photocopied, the policy showed the change in beneficiaries and the complaint was thereupon amended so that Dolores could sue in her own right.

[4]An insurer who, replying to a request as to the status of a policy, denies liability on the basis of a lapse, runs the risk of having waived its right to insist upon the proof of total disability. *Fidelity & Cas. Co.* v. *Riley*, 168 Md. 430, 178 A. 250 (1935); *Missouri State Life Ins. Co.* v. *Carroll*, 174 Okla. 142, 50 P.2d 148 (1935); 17 A.L.R.3d §24 at 590.

payment was waived. It is not too much, said the New Jersey court, to expect that the insurer will make an inquiry with respect to a waiver if it appears that the premium was not paid. What was said about the insurer in *Kampf* is equally applicable to Puritan. The attorney's reference to the insured's decease after a lengthy illness should have alerted Puritan to the possibility that the waiver of premiums portion of the policy would avoid a lapse.

Puritan also contends that it was entitled to a directed verdict on the disability portion of Dolores' claim because the evidence is clear and uncontradicted that Dr. Seabra was by no means totally disabled during the time he set up his residence in his office. In taking this position, the insurer points to certain episodes where, during the spring and summer of 1966, the insured saw a patient, wrote checks, filed a claim with another insurer, paid taxes, and was involved in several other like incidents.

The quick response to this contention is first to look at the policy's definition of "total disability" and then refer to what this court has had to say when dealing with similar insurance company jargon. The pertinent portion of the policy defines "total disability" as: "Any disability which wholly and continuously prevents the Insured from engaging in any occupation or employment for wage or profit * * *." In past years, when confronted with somewhat similar clauses, this court has ruled that they are not to be literally construed; that they are to be liberally and clearly construed in favor of the insured; that there is no necessity for showing that the insured is utterly helpless or unable to do anything; and that the meaning of the definition depends in part upon the occupation and capabilities of the insured and the circumstances of each case. *Colaluca* v. *Monarch Life Ins. Co.*, 101 R.I. 636, 637, 226 A.2d 405, 406 (1967); *Cole* v. *Metropolitan Life Ins.*

*Co.*, 54 R.I. 88, 91-92, 170 A. 74, 75 (1934); *Pannone* v. *John Hancock Mut. Life Ins. Co.*, 52 R.I. 95, 157 A. 876 (1931).

Puritan's phrase "total disability" contemplates an impairment of the mind or body whereby the insured is unable to perform all the substantial or material acts necessary to the successful prosecution of his usual occupation in its usual and customary manner or any other occupation for which he would be qualified by reason of his ability, training, experience, and education. *Russell* v. *Prudential Ins. Co. of America*, 437 F.2d 602, 605 (5th Cir. 1971); *Dittmar* v. *Continental Cas. Co.*, 29 N.J. 532, 544-45, 150 A.2d 666, 672 (1959). *See also* Annot., 21 A.L.R.3d §3 1155, 1165 (1968). Having this definition in mind, it is quite apparent that there is evidence which indicates that, notwithstanding the incidents relied upon by Puritan, Dr. Seabra was for the purposes of the policy totally and permanently disabled. We see no error in the trial justice's denial of the motion for a directed verdict.

In dealing with Puritan's new trial contentions, there is no necessity to cite chapter and verse in this area of the law. We have repeatedly pointed out that a trial justice, in considering a new trial motion, sits as a thirteenth juror, who in the light of his charge to the jury can weigh evidence, assess credibility, and draw reasonable inferences from the testimony. If, upon review, his "superior judgment" indicates that the jury's verdict is contrary to the fair preponderance of the evidence, a new trial must be granted. If, on the other hand, the trial justice believes the evidence is such that different minds can reach different conclusions, the motion for new trial must be denied.

Our job in reviewing the trial justice's determination of a motion for new trial is restricted to two areas: (1) has there been an overlooking or misconceiving of material

evidence; and (2) was the trial justice otherwise clearly wrong? If there is an affirmative reply to either inquiry, there is no automatic award of a new trial. When the response is affirmative, we examine the record and apply our so-called appellate rule, in which we review the record to see if the evidence "strongly preponderates" against the jury's verdict. We look at the record in the light most favorable to the litigant who prevailed before the jury, and if there is any competent evidence to support the verdict, then the evidence does not strongly preponderate against the verdict, and the jury's verdict remains unchanged. *Morinville* v. *Morinville*, 116 R.I. 507, 359 A.2d 48 (1976).

In denying Puritan's motion for a new trial, the trial justice referred to the two theories upon which Dolores had proceeded at trial, and then he limited his remarks to the testimony that related to the waiver of premiums part of the policy. He expressly declared that it was obvious to him that the jury had believed the psychiatrist's testimony and that he too felt that Dr. Seabra, because of his psychiatric condition, was totally disabled for the period of 6 months prior to his death and as a consequence was excused from submitting proof of his disability. It is apparent that the trial justice was of the belief, after his evaluation of the record, that the evidence was such that different minds could reach different conclusions. We see no reason to disturb his finding.

Although the trial justice's failure to discuss the facet of the testimony dealing with Puritan's cashing of the check and its threat to cancel the policy is "clearly wrong," it is not a fatal omission. While the present controversy may be considered as a case being tried to the jury on more than one count, this is not a case where a general verdict is returned but the record indicates that a verdict should have been directed for the defendant at least on

one count. In such instances this court has ordered a new trial because it could not determine if the jury verdict was based solely on that particular count. *Reynolds* v. *Missler,* 79 R.I. 89, 83 A.2d 914 (1951). Such a crisis of uncertainty may be avoided by counsel's employing the provisions of Super. R. Civ. P. 49 and asking the trial court to either allow the submission of written interrogatories to the jury or require the jury to return separate verdicts on each count. *See Apollonio* v. *Kenyon,* 101 R.I. 578, 590, 225 A.2d 778, 785 (1967). However, in this case there was evidence supporting both of Dolores' theories, either one of which, standing alone, would support recovery.

Out of concern for the rights of Puritan, we will apply our appellate rule to that portion of the evidence which was not discussed by the trial justice. When we match the rule with the record, we find that there is competent evidence which would justify a jury verdict based solely on the reinstatement theory. Accordingly, we find no merit to the new trial contentions raised by Puritan.

Finally, we come to the insurer's claim that the trial justice erred when he charged the jury. Super. R. Civ. P. 51(b) requires counsel to lodge their objections to the charge before the jury finally retires to begin its consideration of the case and inform the trial justice of the grounds for the objections. This latter requirement is to afford the trial justice an opportunity to correct his instructions if correction is necessary. *Allen* v. *D'Ercole Constr. Co.,* 104 R.I. 362, 244 A.2d 864 (1968). The objections must be specific enough so that the court's attention is focused on the precise nature of the alleged error. *Housing Authority* v. *Allard,* 106 R.I. 7, 255 A.2d 158 (1969). Otherwise, the trial justice can hardly be expected to divine the nature of counsel's contention. Granted, we have observed that: "Rule 51(b) is not to be viewed with an eagle eye as a vehicle for overlooking trial errors." *Smith Dev. Corp.* v.

*Bilow Enterprises, Inc.,* 112 R.I. 203, 211, 308 A.2d 477, 482 (1973). So long as the trial justice is alerted as to the possible error, no particular formality will be demanded of the objector's verbiage. *Smith Dev. Corp.* v. *Bilow Enterprises, Inc., supra.*

Here the trial justice, after telling the jury that notice and proof might be excused upon a showing of mental incapacity, charged the jury that if it found as a fact that Dr. Seabra was "insane" on April 24, 1966, and remained so until the date of his death, it would find "as a matter of law" that the insured was not bound to give the notice and proof specified in the waiver of premiums portion of the policy. The trial justice then said to the jury: "And if you find that Doctor Seabra was totally disabled from March 4, 1966 to the date of his death, and he was insane from April 24, 1966, to the date of his death, you will find, as a matter of law, that the April 24, 1966 premium was waived and that the Plaintiff should recover under the contract." Thereafter, the trial justice went into a lengthy dissertation as to the factfinding prerogatives of the jury, the burden of proof, damages, and the jury's obligation to render a fair and impartial verdict.

Puritan's objections to those two portions of the charge to which we have just referred are based upon (1) the trial justice's use of the word "insane" when he referred to Dr. Seabra's alleged post April 24, 1966 condition and (2) Dolores' failure to satisfy the proof provisions relating to the waiver of premiums. Since we have already exonerated Dolores so far as the supplying of proof is concerned, we need only discuss the "insanity" issue, having in mind our previous observation that since the appellation "insanity" encompasses the full spectrum of mental abnormalities, there are times when one's use of the term may be imprecise. *State* v. *Nault, supra.* When the trial justice concluded his charge, he asked if there were any "excep-

tions" and Puritan's counsel said that he would like to object to those remarks where the trial justice indicated that recovery could be had if the jury believed that Dr. Seabra was "totally disabled" and "insane" from early March until the time he expired. As noted earlier, an objection to a charge, in order to serve its purpose, must somehow inform the trial justice of the nature of his or her faux pas. Here the simple lodging of an objection fell far short of its purpose. There was nothing in Puritan's objection which would alert the trial justice that his "insanity" terminology was being challenged. Consequently, we see no merit to this phase of the appeal.

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

Mr. Justice Paolino did not participate.

*Albert B. Watt,* for plaintiffs.

*Hinckley, Allen, Salisbury & Parsons, Robert W. Lovegreen,* for defendant.