403 A.2d 248.

EDWARD J. MAJEWSKI *vs.* VERA R. PORTER.

JUNE 29, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J.   Both litigants in this civil action are residents of Connecticut. The plaintiff (Majewski) seeks to recover a $7,500 balance due on a buy-and-sell agreement whereby he sold a private school called Key Punch Academy (the academy) to the defendant (Porter) for the sum of $15,000. Porter filed a counterclaim based upon her assertion that the sale was the direct result of certain misrepresentations made by Majewski. A Superior Court jury found against Majewski on his claim, for Porter on her counterclaim, and awarded her $7,750 in damages. The trial justice denied Majewski's motion for a new trial. Majewski is before us on his appeal in which he claims that the trial justice erred when he (1) refused to embody in his instructions several of Majewski's requests to charge and (2) approved the jury's award of $7,750.

The academy was located on Union Street in downtown

Providence. The academy's physical plant consisted of a leased suite of two rooms located on the fourth floor of the Fletcher Building.

Records of the Board of Regents' Department of Education indicate that in the spring of 1971 Majewski sought and received the Regents' approval of the academy operation. That approval, by its terms, expired on June 30, 1971. At the beginning of July of 1971, Majewski applied for and received the Regents' permission to operate the academy during a 1-year period ending on June 30, 1972.

Majewski's business interests extended beyond the academic area. The record indicates that when he first acquired ownership of the academy, he was operating a Goodyear tire dealership in Enfield, Connecticut. Later, in January 1972, he affiliated with a national investment firm as a broker trainee. Majewski's training took place in New York City. His training completed, Majewski then took up employment in the firm's Hartford office.

In June 1972, Majewski delegated the immediate supervision of the academy's day-to-day operations to its placement director, Judith Holmes (Holmes). Sometime in the latter part of July, Holmes told Majewski that she was planning to leave the academy by the end of 1972. According to Majewski, the director's departure presented him with a problem which could be resolved by any one of three solutions: he could shut down his Providence endeavor, hire a replacement for Holmes, or divest himself of the school. After opting for the third choice, he placed an ad in the business section of the August 6, 1972, edition of the *Providence Sunday Journal*, informing anyone so interested of the opportunity to own a "proven" business for a cash investment of $15,000.

Within days Porter and her husband contacted Majewski. Discussions ensued, and on August 31 Porter purchased·the academy for the $15,000 asking price. A sales agremeent was executed on this date, in which Majewski accepted a deposit

of $100 and Porter agreed to pay $7,400 by the next day, September 1, and then to pay the balance in equal install-ments of $3,750 on the first day of the following months of October and November. Majewski assigned all his interest in the lease to Porter and her husband. The lease contained a stipulation obligating the lessor to obtain the necessary governmental license which would insure the academy's continued operation.

Porter testified that at the signing of the agreement, she was shown a May 1971 letter from the Board of Regents, which, in its pertinent parts, read: "Enclosed is the approved copy of your application for approval of the Keypunch Academy in accordance with the provisions of section 16-40-12 of the General Laws of Rhode Island, 1956, as amended." However, nobody, including Majewski, pointed out that the accompanying approval had terminated, by its terms, a month earlier, on July 1. At the closing, Holmes mentioned to Majewski that the fire inspector had visited the premises. When Porter inquired about the purpose of the inspector's visit, she was told by Majewski that it was nothing to worry about; it was just a routine inspection.

Problems began to envelop the Porters in early September. On September 8 a letter addressed to Majewski was received at the academy from the Department of Education. When Porter read the letter, she then became aware that Majewski had never filed an application for the renewal of the academy's license for the 1972-73 year, which began on July 1. The letter warned Majewski that if he did not present evi-dence to the department indicating that the school was in compliance with standards demanded by Providence's building inspector and the State's Department of Health and its Division of Fire Safety, the department would so inform the commissioner of education and recommend the termina-tion of the academy's operation. Porter for the first time became aware of the lack of accreditation and refused to pay the balance due.

In time, certificates relating to the structural integrity and

sanitary conditions of the school were obtained. However, fire safety approval was never obtained. The premises had been inspected by representatives of the fire marshall's office on several occasions during May and June; numerous violations of the fire code were discovered and reported but nothing was done to remedy the situation. In a letter dated September 6, 1972, a deputy fire marshall reported to the department of education that the school's continued operation could not be approved. In mid-October the Porters decided to move to another building, and the department agreed to maintain the status quo in light of the proposed move. When the first day of 1973 arrived, the Porters and the academy were in residence at a new location in a firesafe building. The Porters received the necessary departmental approval in mid-February. However, later, on March 31, 1973, they shut down the academy and attributed this decision to a declining enrollment.

At trial Majewski conceded that prior to August 31, 1972, he had told Porter on several occasions that the academy's educational endeavors had been approved by the department. He also stated that he had acted in good faith at all times and that he thought that the necessary papers attendant to the renewal of the annual license had been taken care of either by Holmes or the lessor's president.

An instructor at the academy testified for Porter. She described Holmes as being Majewski's partner. The instructor reported that Holmes had told her about the fire marshall's visit, the school's nonaccreditation, and Holmes' fear that the sale would not be consummated if the Porters ever found out about these developments.

While Majewski objected to the trial justice's failure to adopt thirteen of his fourteen specific requests to charge, the only request meriting discussion relates to Majewski's contention that the initial approval given the academy's operation on May 6, 1971, was in full force and effect when the sale took place in August 1972. Majewski bases this contention on his belief that there is no statutory authority for the Regents'

regulation calling for an annual licensure of private schools. The trial justice rejected this contention, relying in part on its inappositeness to the issues raised at trial and in part on his reliance upon the provisions of G.L. 1956 (1969 Reenactment) §16-40-12. There the General Assembly has made it clear that no private school offering instruction in any academic or vocational field to students above the compulsory school age can operate unless it has received approval from the Board of Regents, and such operation may continue only as long as this approval remains in force. This statute requires all such schools to file an annual report with the Regents in July of each year on prescribed forms furnished by the department. The forms seek such information as the number of different people enrolled, the fields of education covered, the length of the course, the number of teachers employed, and "such other facts as the said board may require."

We uphold the trial justice's failure to charge solely on the basis of the immateriality of the contention. It is a well-established principle of law that a trial justice is required to instruct the jury concerning the law applicable to the factual issues developed at trial. *Ballet Fabrics* v. *Four Dee Realty Co.*, 112 R.I. 612, 621, 314 A.2d 1, 6 (1974); *Goldis* v. *Fairchild*, 103 R.I. 746, 750, 241 A.2d 298, 301 (1968).

At trial the jury heard contradictory evidence about whether Porter bought the academy because of her reliance on Majewski's false representations concerning the current status of the school's license for the 1972-73 year. At no time did Majewski ever testify that he had told Porter that the academy was operating by virtue of the grant of its original license because of his belief that the application renewals had no warrant in law. To the contrary, Majewski admitted that he was well aware that the license had to be renewed annually. In fact, he had applied for and received the 1-year renewal that expired on June 30, 1971. Since the board's licensing authority was never a factual issue to be decided by the jury, Majewski's request to charge was properly refused, for, as noted by the trial justice, the board's authority to

demand a yearly renewal of the license was a collateral issue that was totally irrelevant to a proper disposition of Porter's counterclaim.

In the final facet of his appeal, Majewski questions the jury award of damages of $7,750 as well as the trial justice's approval of this sum. An individual who has been induced by fraud to enter into a contract may elect to rescind the contract and receive what he has paid pursuant to its terms— or affirm the contract and sue in an action for deceit. *Halpert v. Rosenthal*, 107 R.I. 406, 412, 267 A.2d 730, 733 (1970); *Goodwin v. Silverman*, 71 R.I. 163, 164, 43 A.2d 50, 50 (1945). Here, Porter pleaded her counterclaim in the alternative. She sought either a rescission and return of the $7,500 paid or an award of compensatory and punitive damages.

Punitive damages were removed as an issue when the trial justice, before giving his charge, informed counsel that there was nothing in the testimony that called for the assessment of punitive damages and, in charging on the damages phase of Porter's counterclaim, the trial justice told the jury that Porter had the burden of establishing each element of her claim for damages by a fair preponderance of the evidence and that any award it gave her must be "in that amount necessary and proven to your satisfaction that will make her whole insofar as it is possible, any damages, financial damages, she incurred as a result of this contract." During its deliberations, the jury submitted a written inquiry to the trial justice: "Does the defendant's counterclaim include the return of original payment on August 31, 1972? Or, does it include only the amount incurred during and after her relocation?" The response to this inquiry was: "[S]he is entitled to whatever sum in your judgment is needed to make her whole." When the trial justice asked if there were any objections to his additional instruction, Majewski's counsel replied: "I think there will be one for me, your Honor. My impression this morning, in your charge, was that they were entitled to compensatory damages established. I think we are all aware of what they are. If it is intended that they should be exceeded by a return of any consideration paid for a piece

of business, or the business, which she enjoyed an operation of for seven months, I certainly object to the implication that if that deposit as made under the contract becomes a part of their damage, and to that extent I take objection to the charge."

Majewski now argues with great vigor before us that he is entitled to a new trial, at least as far as damages were concerned, because Porter had failed to exercise her right to rescind "promptly." His reference to rescission reminds us that this court has ruled that the right to rescind must be exercised within a reasonable time after the discovery of the facts which give rise to that right. *Evangelista v. Antonio De Cubellis, Inc.*, 79 R.I. 142, 148, 85 A.2d 69, 72 (1951). Earlier, in *Monast v. Manhattan Life Insurance Co.*, 32 R.I. 557, 576, 79 A. 932, 939 (1911), it was said that the right "must be exercised with great promptness after discovery of the truth * * *." The difference between the two standards is semantic and can best be resolved by taking the word "reasonable" from *Evangelista* and "promptness" from *Monast*, combining the two, and establishing a standard calling for "reasonable promptness."

The first time any reference to the doctrine of rescission was brought to the trial justice's attention came when Majewski's motion for a new trial was being considered. A trial justice, in considering motions for new trial, is bound to consider the motion in the light of the charge given the jury. Here, at no time did Majewski ever ask the trial justice to charge the jury on the doctrine of rescission. Although the trial justice never attempted to explain the distinction between the tort counterclaim and the counterclaim for recission or that the counterclaims afford alternative sources of relief in which, if one is granted, the other is withheld, no objection was ever lodged to his failure to explain these matters to the jury. None of Majewski's fourteen specific requests to charge even allude to the rescission issue. Super. R. Civ. P. 51(b) bars a party from challenging an erroneous instruction unless he lodges an objection to the charge which is specific enough to alert the trial justice as to the nature of

his alleged error. *Seabra* v. *Puritan Life Insurance Co.*, 117 R.I. 488, 503-04, 369 A.2d 652, 661 (1977).

While no particular phraseology will be demanded of the objector, he or she must express himself or herself in such a way as to call the trial justice's attention to the question of law involved. *Smith Development Corp.* v. *Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973). Here, there is nothing in the brief and obtuse reference to Porter's "enjoyable" 7-month operation of the academy which tells the trial justice that he should have charged the jury in conformity with *Evangelista, Monast,* and Williston and that, if rescission is called for, the jury cannot consider the tort claim. Since Majewski's objection failed to inform the trial justice of the possible error of his ways, we see no merit to this facet of Majewski's appeal.

The plaintiff's appeal is denied and dismissed, and the judgment appealed from is affirmed.

*Lee A. Worell, Esq.,* for plaintiff.

*Edwards & Angell, John H. Blish, Esq.,* for defendant.