Cindy L. PATINO, as Administratrix of the Estate of Eugene J. Janarelli et al.

v.

Frank SUCHNIK et al.

No. 99–563–APPEAL.

Supreme Court of Rhode Island.

May 11, 2001.

Robert D. Parrillo, Providence, for Plaintiff.

Michael DeSisto, Providence, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

This appeal challenges a trial justice's jury instructions concerning the alleged gross negligence of emergency rescue workers (EMTs) in deciding not to transport an injured party to a hospital. Following complications ensuing from a head wound, the injured party died approximately one year after the incident in question. The plaintiffs, Cindy L. Patino, as administratrix of the estate of Eugene J. Janarelli (Janarelli), and Denise Laurens on behalf of her minor children, Crystal Laurens and Kayla Laurens, appeal from a Superior Court judgment in favor of the defendants, Frank Suchnik in

his capacity as Treasurer for the City of Central Falls, Robert Noury, Steven Ouellette, K.L.C. Associates, Inc. d/b/a Macondo and Augusto Garrces a/k/a Luis Garces. After reviewing the parties' pre-briefing statements, a single justice of this Court ordered the parties to show cause why the issues raised in this appeal should not be summarily decided. Because no such cause has been shown, we proceed to do so.

The key question for the jury in this case was whether the defendant EMTs were grossly negligent in deciding that the injured Janarelli did not need to go to the hospital.[1] Earlier in the evening Janarelli had been struck on the head by a beer bottle at a nightclub. He was nursing a small head wound and reposing at his girlfriend's apartment when he started to complain about his aching head. The rescue personnel arrived to examine him in the early morning hours of January 2, 1993. Earlier, Janarelli's girlfriend had called 9–1–1 at Janarelli's request and asked for emergency assistance. Shortly thereafter, two EMTs arrived at the apartment and the girlfriend escorted them to the bedroom where Janarelli was lying diagonally face down on a bed.

The EMTs testified that shortly after they arrived they asked Janarelli whether he wanted to go to the hospital. Initially, Janarelli indicated that he wanted to go to the hospital, and the EMTs ordered an ambulance to be dispatched. According to the EMTs, they began to take Janarelli's vital signs, but he increasingly resisted their ministrations. Although the EMTs asked Janarelli some questions, Janarelli's girlfriend did not recall seeing them perform any diagnostic tests on him. The EMTs asserted that because Janarelli pulled away from them, they could not use the blood pressure cuff to take his blood pressure; as a result, they were forced to take it by hand from his wrist. After observing and questioning Janarelli further and after checking other diagnostic indicators, the EMTs concluded that Janarelli was not in need of medical attention. Nevertheless, because Janarelli had indicated previously that he wanted to go to the hospital, the EMTs were prepared to help him do so. While waiting for the ambulance to arrive, the EMTs suggested to Janarelli that he put some pants on for the trip out to the ambulance. Even with the assistance of his girlfriend, however, Janarelli apparently experienced problems in attempting to do so. Finally, after becoming very impatient and frustrated, he eventually refused to dress. Janarelli then reportedly told the EMTs that he did not want to go to the hospital. The EMTs testified that they repeatedly asked if he was sure he did not want to go, but that he did not change his mind. Therefore, on the basis that they did not believe Janarelli was in need of hospital care anyway, the EMTs called and canceled the ambulance.

As they were leaving the apartment, the EMTs testified that they told Janarelli's girlfriend to call them immediately if Janarelli started to exhibit any signs of further medical problems, such as vomiting. Janarelli's girlfriend denied that they gave her this advice. In any event, although Janarelli began vomiting only an hour or so after the EMTs left the apartment, his girlfriend insisted that she was unaware that this development signaled a potential problem for Janarelli that called for further medical attention. By the next morning when he was finally taken to the hospital, Janarelli was unconscious. After

---

**1.** Pursuant to G.L.1956 § 23–4.1–12(a), emergency rescue personnel enjoy a qualified immunity from negligence claims, provided they are not guilty of gross negligence or willful misconduct in performing their functions.

spending a year in the hospital, Janarelli died from the head injury he received on the night in question.

The plaintiffs offered expert testimony from a neurologist who testified that Janarelli's symptoms indicated that "something [was] not right" and that further evaluation (that is, a CT scan) was necessary to properly diagnose and treat his injury. In addition, plaintiffs offered the expert testimony of an EMT trainer. Relying upon the Department of Health protocol in this state governing the conduct of EMTs, he concluded that the EMTs had breached their duty of care. In contrast, defendants offered the expert testimony of an EMT trainer who opined—based upon the same protocol and based upon the materials used to train the EMTs—that the EMTs had acted in accordance with the standard of their profession.

Before jury deliberations began, plaintiffs requested jury instructions based in part on the Department of Health protocol for EMTs. The trial justice rejected these instructions and charged the jury generally that Rhode Island law provides qualified immunity for EMTs and that they could be held liable only if their alleged misconduct was a result of gross negligence or willful misconduct. The trial justice then gave the jury a broad definition of gross negligence without specifying in detail the specific duty of care owed by the EMTs to Janarelli. The plaintiffs objected generally to the instructions: "[t]he definition of gross negligence, I would suggest that it ought to have been in accordance with my request for charge, and would object as far as it is inconsistent. With respect to my request [sic] 4 through 13, with regard to duty and so forth owed by the defendants to plaintiffs, I respectfully object. These have not been given." The trial justice refused to amend or supplement his instructions and

the jury found that plaintiffs failed to prove by a fair preponderance of the evidence that the acts or omissions of either of the EMTs individually or in their joint capacity constituted gross negligence or willful misconduct that had proximately caused Janarelli's death.

## Analysis

■ The key issue in this case was whether the EMTs were grossly negligent in concluding that Janarelli did not need further treatment at the hospital. Both EMTs testified that, after observing Janarelli and questioning him, they did not believe that he needed to go to the hospital. The instructions requested by plaintiffs, however, would have removed this issue from the jury's consideration because they required the EMTs to warn Janarelli of the potential adverse consequences of his refusing hospital treatment—irrespective of whether the workers ever had offered him such treatment or had been grossly negligent in concluding that Janarelli needed no such treatment. Thus, the proffered instructions improperly assumed that the rescue workers had been grossly negligent in failing to determine that Janarelli needed hospital treatment, in failing to proffer that treatment to him, and in failing to warn him that his refusal of needed and proffered hospital treatment might still result in serious adverse consequences to him.

The plaintiffs argue that the trial justice committed reversible error by refusing to charge the jury consistent with their requests. Allegedly, without these instructions, the jury was not properly informed of the standard of care owed by the EMTs to Janarelli and therefore could not have correctly assessed whether the EMTs were grossly negligent. The plaintiffs' proposed instructions were based upon the Rhode Island Department of Health Ambulance/Rescue Report Form Instructions

(protocol), which define an EMT's duty of care with respect to a patient who has refused proffered care or assistance. According to the protocol:

"The EMT must inform the patient that if s/he does not permit the EMT to provide *the particular service or treatment recommended* that the patient may suffer some particular harm. If the patient declines assistance, the EMT must urge the patient to consent to care, in recognition of the possibly harmful consequences of not being treated or taken to a medical facility. If a competent patient declines examination, treatment, or transportation with the knowledge that harm may (or is likely to) result, then the patient's refusal is an informed one, and legally valid." Division of Emergency Medical Services, Department of Health, State of Rhode Island and Providence Plantations, *Ambulance/Rescue Report Form Instructions*, § 3.5 at 16 (June 1986). (Emphasis added.)

This protocol, however, contains an implicit predicate that an EMT or some other health-care provider already has determined that the patient needs further medical "assistance" and that some "particular service or treatment [has been] recommended" to the patient. Only *after* an EMT or some other health-care provider has made such a determination and recommended it to the patient and only after the patient has "decline[d] assistance" that has been recommended to him or her is the EMT then required by the protocol to "urge the patient to consent to care" and "inform" the patient of "the possibly harmful consequences of not being treated or taken to a medical facility." The plaintiffs, however, proposed to misstate this standard of care to the jury by omitting the predicate requirement that EMTs (or some other health-care provider) must *first* determine that a patient needs hospi-

tal care and recommend that treatment to the patient—who then refuses it—*before* the EMTs would be bound to "urge" and "inform" the patient to consent to "the particular service or treatment recommended." Specifically, plaintiffs proposed to instruct the jury that "[i]n this case the EMTs had a duty to inform Mr. Janarelli that if he refused transportation to a hospital, he could suffer severe brain injury and die." Such an instruction clearly would have confused the jury and led them to the incorrect assumption that either there were no predicate requirements to EMTs giving such a warning, as described above, or that the predicate requirements had been satisfied in this case, a conclusion that was very much in dispute given the evidence before the court and jury.

■ Although a trial justice must "determine and instruct the jury concerning what legal duty is owed to the plaintiff under the various alternative factual scenarios supported by the evidence," *Kuzniar v. Keach*, 709 A.2d 1050, 1055 (R.I. 1998), he or she may not interfere with the jurors' exclusive role as fact-finders by instructing them to make or to assume any particular finding of fact when that fact is disputed by the evidence presented. *See id.; see also Morinville v. Old Colony Cooperative Newport National Bank*, 522 A.2d 1218, 1222 (R.I.1987) ("A trial justice fulfills his or her obligation to charge the jury properly by framing the issues in such a way that the instructions 'reasonably set forth all of the propositions of law that relate to material issues of fact which the evidence tends to support.' "). Therefore, because the EMTs had *no* duty to "urge" and "inform" hospital treatment upon Janarelli *unless* they (or some other health-care provider) first had concluded that Janarelli actually needed such care, and then had recommended it to him, only to have him refuse it, and because the

question of whether they were grossly negligent in concluding that he did not need such care was a question of fact reserved for the jury, the trial justice properly refused plaintiffs' incomplete and misleading instructions.

The plaintiffs also proposed that the trial justice instruct the jury that the EMTs "shall be considered liable to plaintiffs," if they failed to "urge" or "inform" Janarelli as required by the protocol. But giving such an instruction would have been a clear misstatement of the law. Even if the EMTs had breached their duty under the protocol, they would not necessarily have been liable to the plaintiffs. Under G.L. 1956 § 23–4.1–12(a), the EMTs could not be held liable "unless [their] act or omission was the result of gross negligence or willful misconduct." Finally, because it was not the law that the EMTs had an absolute duty to transport Janarelli to the hospital or that they had a duty to attend to Janarelli "until they were relieved by an ambulance crew," the instructions proposed by plaintiffs that so provided were also properly rejected.

■ Having held that the trial justice properly rejected all the jury instructions requested by plaintiffs, we next consider plaintiffs' general objection to the charge given by the trial justice. In their brief to this Court, plaintiffs argue that "the trial justice's refusal to charge the jury regarding the EMTs' duties and responsibilities as defined and required by the Department of Health protocols constitutes reversible error." But when plaintiffs' counsel was asked by the trial justice whether he had any objections to the charge as given, counsel responded that "[t]he definition of gross negligence, I would suggest that it ought to have been in accordance with my request for charge, and would object as far as it is inconsistent. With respect to my request [*sic*] 4 through 13, with regard to duty and so forth owed by the defendants to plaintiffs, I respectfully object. These have not been given."

■ We review a trial justice's charge to the jury in its entirety, " 'in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give [to the instructions].' " *Neri v. Nationwide Mutual Fire Insurance Co.*, 719 A.2d 1150, 1153 (R.I.1998). "An erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." *Brodeur v. Desrosiers*, 505 A.2d 418, 422 (R.I.1986) (quoting *Anter v. Ambeault*, 104 R.I. 496, 501, 245 A.2d 137, 139 (1968)). Even if we were to assume that the trial justice's charge to the jury was erroneous because he failed to define sufficiently the applicable standard of care, as plaintiffs allege, we still would not reverse because plaintiffs' objection to the jury instructions was not "specific enough to alert the trial justice as to the nature of his alleged error." [2] *Majewski v. Porter*, 121 R.I. 757, 764–65,

---

**2.** Nor can we rule in favor of plaintiffs based upon the "plain error rule," because we do not follow it in this jurisdiction. *See Rhode Island Depositors Economic Protection Corp. v. Rignanese*, 714 A.2d 1190, 1196–97 (R.I. 1998) ("It is well settled that this Court will not consider on appeal an issue that was not raised before the trial court. * * * An exception to the raise-or-waive rule is that this Court will review allegations of violations of basic constitutional rights but even then only in very narrow circumstances."). *Compare State v. Rupert*, 649 A.2d 1013, 1015 (R.I. 1994) (stating that "[i]t is well established that Rhode Island does not recognize the plain-error rule"), *with Provencher v. CVS Pharmacy*, 145 F.3d 5, 9 (1st Cir.1998) (holding that the court will review for plain error even when a party fails to object and that "[p]lain error applies only where the error results in a clear miscarriage of justice or seriously affects the fairness, integrity or public reputation of the proceedings").

403 A.2d 248, 252 (1979) (holding that Rule 51(b) of the Superior Court Rules of Civil Procedure "bars a party from challenging an erroneous instruction unless he lodges an objection to the charge which is specific enough to alert the trial justice as to the nature of his alleged error"); *see also Kelly v. Kalian*, 442 A.2d 890, 892 (R.I.1982); *Seabra v. Puritan Life Insurance Co.*, 117 R.I. 488, 503, 369 A.2d 652, 661 (1977).

Rule 51(b) of the Superior Court Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." Here, by merely objecting generally to the court's gross-negligence instruction to the extent that it was inconsistent with the plaintiffs' proposed instructions (which either misstated the law and/or assumed facts for the jury that were disputed), the plaintiffs failed to satisfy their burden under Rule 51(b) to alert the trial justice to the specifics of how and why his instructions failed to inform the jury on the proper standard of care for EMTs in this situation. Moreover, the trial justice "hardly [could have been] expected to divine the nature of [their] contention." *Seabra*, 117 R.I. at 503, 369 A.2d at 661.

### Conclusion

Therefore, we conclude that because the plaintiffs did not object to the trial justice's instructions with sufficient specificity beyond pointing to their alleged inconsistency with their own flawed proposed instructions, they failed to preserve for appeal any objection to the given standard-of-care instruction. Accordingly, we deny the plaintiffs' appeal and affirm the trial court's judgment.