Geraldine MILLS, M.D.

v.

STATE SALES, INC., et al.

No. 2001–82–Appeal.

Supreme Court of Rhode Island.

June 10, 2003.

Geraldine Mills, pro se, Judith I. Scott, Warwick, Robert A. Scott, Westerly, for Plaintiff.

Steven John Deluca, Providence, Kevin M. Daley, Warwick, Paul V. Reynolds, John W. Kershaw, John G. Hines, Carol Nicholson Glick, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS and GOLDBERG, JJ.

**OPINION**

PER CURIAM.

The plaintiff, Geraldine Mills, M.D. (plaintiff), appeals *pro se* from a summary judgment entered in favor of defendant, Robert F. Weisberg (Weisberg). She also appeals from a judgment as a matter of law entered in favor of State Sales, Incorporated (State Sales), Beaulieu of America, Incorporated (Beaulieu), and Gloria Na-

habedian (Nahabedian) (collectively referred to as defendants).

This case came before the Supreme Court for oral argument on April 9, 2003,[1] pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and proceed to decide the appeal at this time. For the reasons set forth herein, we affirm the judgments of the Superior Court.

## I

### Facts and Travel

The plaintiff is a pediatrician who maintained her practice in an office that she rented from Nahabedian. In March 1996, a leak from an upstairs office damaged the carpeting in plaintiff's office. On July 16, Nahabedian replaced the carpet with one that was manufactured by Beaulieu and sold and installed by State Sales.

The plaintiff alleged that the replacement carpet emitted toxic fumes that caused her and her patients to become ill. She described her symptoms as dizziness, scratchy throat, vertigo, headache, and pressure in her ears. The plaintiff contacted defendants to inform them of the alleged problems with the carpet, but she says that they failed to correct the situation. As a result of the alleged noxious fumes and odors emanating from the carpet, plaintiff says she was forced to vacate the office on August 9, 1996. In vacating the office, plaintiff removed all her belong-

---

1. At oral argument, plaintiff complained that she did not receive notice that this Court would hear argument on her summary judgment appeal. However, when plaintiff filed this appeal, it was docketed as Supreme Court case No.2001–82–A. Thereafter, plaintiff submitted memoranda to this Court dis-

cussing the summary judgment motion and specifically referring to case No.2001–82–A. Accordingly, when the clerk of this Court notified plaintiff that we would be hearing arguments on case No.2001–82–A, plaintiff should have been aware that we would be considering this issue at argument.

ings, including her furniture and her patients' medical files. In a separate case, plaintiff filed suit against Nahabedian for constructive eviction.

The plaintiff contacted the Department of Health (department) to express her concerns about the fumes emitted from the carpet. On August 14, 1996, the department sent Weisberg, an employee of Environmental Monitoring and Training, Incorporated, to plaintiff's vacant office. Weisberg conducted air quality testing and removed a section of the carpet for further testing. Weisberg's tests failed to reveal the presence of any toxic substances or fumes.

The plaintiff says that on June 3, 1998, she learned that belongings she removed from her office may have been contaminated by the fumes allegedly emitted from the carpet. In July 1999, plaintiff filed the instant action against Weisberg and defendants, contending that the carpet was defective and/or chemicals were negligently applied to the carpet, thereby causing her personal injuries. Additionally, plaintiff argued that Weisberg's negligent testing of the office and the carpet led to her prolonged exposure to the alleged toxins. Specifically, she argued that if Weisberg had detected the toxins, she could have minimized her injuries by discarding the medical files she removed from the office, which she says absorbed the toxic fumes while they were in the office. On February 16, 2000, plaintiff's case against Nahabedian for constructive eviction was consolidated with her case against Weisberg and defendants.

In October 2000, Weisberg moved for summary judgment, pointing to an absence of any evidence that his alleged negligence proximately caused plaintiff's injuries. He further asserted that plaintiff presented no evidence of the nature of the toxic substance that allegedly harmed her and that he never was asked to test any of the materials that were taken from the office that plaintiff alleged contributed to her injuries. At the hearing, plaintiff said that she was diagnosed as having been exposed to toxic substances that were absorbed into her belongings from the carpet. However, she did not present any expert evidence to support her case. Because plaintiff did not present sufficient evidence of a causal relationship between her alleged injuries and Weisberg's alleged negligence, the hearing justice granted summary judgment in favor of Weisberg. That judgment was certified pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure. In December 2000, plaintiff filed her first appeal to this Court from the grant of summary judgment in favor of Weisberg. She continued to pursue her personal injury claims against the remaining defendants in Superior Court.

In March 2001, the hearing justice scheduled a trial for September 4, 2001, on plaintiff's claims against defendants. At that time, the hearing justice also crafted a pretrial order that carefully outlined the schedule for various discovery and other pretrial matters. The plaintiff's legal counsel at that time, Damon D'Ambrosio, Esquire (D'Ambrosio), and defendants agreed to adhere to the provisions in that order.

Shortly thereafter, the relationship between plaintiff and D'Ambrosio began to deteriorate and D'Ambrosio filed a motion to withdraw. The hearing justice heard D'Ambrosio's motion on July 9, 2001. D'Ambrosio testified that plaintiff repeatedly harassed him and questioned his competence and commitment to her. The plaintiff acknowledged that her relationship with D'Ambrosio had been troubled in the past but believed it had been "patched up." Nevertheless, the hearing justice permitted D'Ambrosio to withdraw.

On July 20, plaintiff retained attorneys Robert Scott and Judith Scott. Thereafter, she moved for a continuance of the September trial date. That motion was heard on July 27. At the hearing, plaintiff argued that she needed a continuance to properly respond to defendants' discovery requests and to review scientific data to ensure its admissibility at trial. She further requested additional time to retain an expert because the deadline for identifying expert witnesses that was set forth in the March pretrial order had passed. The hearing justice refused to grant the continuance. She did, however, grant plaintiff four days to identify her experts and relaxed other discovery deadlines to accommodate the fact that plaintiff had recently retained new counsel.

Seizing the opportunity to retain experts for her case, plaintiff enlisted Kenneth Reed, Ph.D. (Dr. Reed), and toxicologist Joseph Regna, M.D. (Dr. Regna), as expert witnesses. Doctors Reed and Regna were deposed in August 2001. Based on their deposition testimony, defendants requested a hearing to challenge the validity and relevance of the experts' proposed trial testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677 (R.I.1999). Thereafter, plaintiff filed a motion to replace Dr. Regna out of concern over his efficacy as an expert witness. The plaintiff, however, decided to "work with" Dr. Regna and quickly withdrew her motion.

When the case was reached for trial on September 4, 2001, the hearing justice conducted a pretrial *Daubert* hearing. Doctor Reed testified first. He said that he had not tested the actual carpet in plaintiff's office. However, based on a mathematical model, Dr. Reed concluded that the carpet in plaintiff's office emitted volatile organic compounds (VOC), including hexane. He further testified that 55 percent of carpets he had tested contained hexane. Based on these facts and the presence of hexane in plaintiff's blood without an alternative explanation, Dr. Reed opined that the carpet emitted hexane. On cross-examination, however, Dr. Reed admitted that he could not state with certainty whether the carpet was the source of plaintiff's exposure to hexane and the cause of her injuries. He also admitted that he was the only person to use his particular mathematical model to quantify hexane emissions from carpets.

Next, plaintiff presented Dr. Regna to establish a causal relationship between the emitted toxins and her health problems. Doctor Regna testified that, based on the onset of the symptoms suffered by plaintiff and after having "investigated some of the literature," he concluded that she had been exposed to VOCs. However, when asked about hexane exposure in particular, Dr. Regna was unable to answer questions about the level of exposure necessary to cause plaintiff's physical symptoms or the length of time the symptoms would last after exposure had ended.

After plaintiff concluded her direct examination of Dr. Regna, but before defendants cross-examined him, plaintiff asked for a continuance. The plaintiff alleged that Dr. Regna was unable to offer an expert opinion in a manner that would be helpful to the jury and requested the continuance to retain a new expert. The only expert plaintiff identified to help her case, however, was one whom she acknowledged she could not afford to hire. The hearing justice refused to grant the continuance but did allow plaintiff to continue with direct examination of Dr. Regna during the *Daubert* hearing.

Upon further examination, Dr. Regna commented on certain articles describing the effects of hexane exposure to rats. He

also noted that blood can be saturated with hexane within ten minutes of exposure. Doctor Regna admitted, however, that his opinion about the cause of plaintiff's injuries was not based on those articles. Rather, he said the articles "buttressed" his previous opinion. He further admitted that he could not say whether the amount of hexane plaintiff allegedly was exposed to caused her injuries.

After the parties finished examining Drs. Reed and Regna, the hearing justice concluded that their opinions could not withstand scrutiny under the standards identified in *Daubert* and *DiPetrillo* and refused to allow them to testify before the jury. She further deemed Dr. Regna unqualified to offer an expert opinion in the case. Based on the hearing justice's ruling, defendants immediately moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure. Because the exclusion of plaintiff's proposed experts precluded her from establishing a causal relationship between the carpet and her injuries, the hearing justice granted defendants' motion on September 6, 2001.[2] The plaintiff timely appealed.[3]

## II

### Summary Judgment for Weisberg

The plaintiff first argues that the hearing justice erred in granting Weisberg's motion for summary judgment. This Court will review a hearing justice's grant or denial of a motion for summary judgment *de novo*, applying the same standards as the hearing justice. *See Heflin v. Koszela*, 774 A.2d 25, 29 (R.I.2001). In ruling on a motion for summary judgment, the hearing justice reviews the evidence in the light most favorable to the nonmoving party. *See id.* Summary judgment is appropriate if there are no genuine issues of material fact remaining and the moving party is entitled to judgment as a matter of law. *See id.* The moving party bears the initial burden of demonstrating the absence of questions of material fact. *See id.* That burden may be satisfied by "submitting evidentiary materials, such as interrogatory answers, deposition testimony, admissions, or other specific documents, and/or pointing to the absence of such items in the evidence adduced by the parties." *Id.* (quoting *Doe v. Gelineau*, 732 A.2d 43, 48 (R.I.1999)). If the moving party satisfies this initial burden, the nonmoving party then must identify any evidentiary materials already before the court or present its own evidence demonstrating that factual questions remain. *See id*

 The plaintiff's claim against Weisberg sounded in negligence. To succeed on a claim for negligence, "a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." *Je-*

2. The hearing justice, however, determined that the exclusion of the experts' testimony would have no bearing on plaintiff's case against Nahabedian for constructive eviction and that case was passed for trial.

3. The plaintiff's claims against defendants (including Nahabedian), were asserted in Superior Court case KC 99–542. Her claim against Nahabedian individually for constructive eviction was made in Superior Court case KC 97–405. Although the cases were consoli-

dated, they maintained their separate identities. *See Marandola v. Hillcrest Builders, Inc.*, 102 R.I. 46, 49–50, 227 A.2d 785, 788 (1967). The hearing justice's dismissal of plaintiff's claims in favor of defendants disposed of all claims against all defendants concerning case KC 99–542 and effectively severed the two cases. Thus, certification pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure was not required before plaintiff could appeal from the September 6 ruling.

nard v. Halpin, 567 A.2d 368, 370 (R.I. 1989). Moreover, expert testimony is required to establish any matter that is not obvious to a lay person and thus lies beyond common knowledge. See Boccasile v. Cajun Music Limited, 694 A.2d 686, 690 (R.I.1997). "In order to prove negligent inspection and testing a plaintiff must establish a standard of care with respect to inspection and testing and the defendant's deviation from that standard." Scittarelli v. Providence Gas Co., 415 A.2d 1040, 1043 (R.I.1980). Further, we do not hesitate to conclude that the existence of a causal relationship between a particular toxin and its effect on the human body would have to be established through expert testimony.

 Here, Weisberg was sent by the department to plaintiff's office to conduct environmental testing to detect the presence of toxins. The gravamen of plaintiff's claim against Weisberg was his alleged negligent testing of her office. In response to Weisberg's summary judgment motion, however, plaintiff failed to come forward with any expert evidence to establish the standard of care expected of him or any evidence that he deviated from that standard. She also failed to present any expert evidence that Weisberg's alleged negligence caused her injuries. Rather, when asked about her ability to establish the causal connection between the toxins alleged to have been absorbed into her patients' medical files and her injuries, plaintiff said that she could establish the causal connection by using expert testimony. However, a party opposing a motion for summary judgment "cannot rest upon mere allegations or denials." Paradis v. Zarrella, 683 A.2d 1337, 1339 (R.I.1996). Without providing an expert's affidavit or other appropriate scientific evidence, there was no evidence capable of substantiating plaintiff's claim that Weisberg's alleged negligence proximately caused her inju-

ries. Similarly, plaintiff failed to present any evidence to the hearing justice establishing the standard of care against which Weisberg's conduct could be measured. Accordingly, Weisberg was entitled to summary judgment.

## III

### D'Ambrosio's Motion to Withdraw

 The plaintiff next challenges the hearing justice's grant of D'Ambrosio's motion to withdraw as her counsel. When ruling on an attorney's motion to withdraw, the hearing justice, in his or her sound discretion, should consider "the reasons necessitating the withdrawal, the efficient and proper operation of the court, and the effect that granting or denying the motion will have on the parties to the litigation." Carter v. Dworkin, 561 A.2d 389, 391 (R.I.1989) (per curiam). This Court will not disturb the hearing justice's ruling on such a motion absent an abuse of discretion. See id.

At the hearing on D'Ambrosio's motion to withdraw, the hearing justice read from a letter that plaintiff wrote to D'Ambrosio, which said: "This is a formal request to ask for your withdrawal on my case. * * * I completely agree with your motion to withdraw." Based on this letter and others expressing similar sentiments, the hearing justice concluded that there was an irreparable breakdown in the relationship between plaintiff and D'Ambrosio. Although plaintiff believed their relationship had been "patched up" by the time of the hearing, D'Ambrosio's comments proved otherwise. D'Ambrosio alleged that plaintiff had threatened to report him to the Supreme Court Disciplinary Board and had repeatedly questioned his competence. It is clear that to force D'Ambrosio to continue representing plaintiff under these circumstances would be damaging to both and that his desire to withdraw was

warranted. At the time of the hearing, there were no additional motions pending before the court in this matter. Thus, the decision to allow D'Ambrosio to withdraw did not significantly affect the proper operation of the court. Further, plaintiff retained new counsel approximately one week after D'Ambrosio withdrew. There is no reason to believe that the decision to allow D'Ambrosio to withdraw negatively affected plaintiff. Accordingly, the hearing justice did not abuse her discretion in granting the motion.

## IV

### Continuance

■■■ The plaintiff next challenges the hearing justice's refusal to grant her motion of July 27, 2001, for a continuance of the trial date. A trial justice is vested with great authority in managing his or her trial calendar. "[T]he management of a trial calendar is among the most difficult of all judicial assignments. * * * Consequently the widest discretion must be given to calendar justices and trial justices in carrying out this enormously difficult function * * *." *Boucher v. Galvin*, 571 A.2d 35, 37 (R.I.1990). This Court will not disturb a trial justice's decision to grant or deny a request for a continuance absent an abuse of discretion. *See id.*

■■■ The plaintiff contends that the hearing justice should have continued the trial date to allow her new counsel time to adequately prepare. In refusing to grant the continuance, the hearing justice referred to the care with which she crafted the pretrial order. The order was prepared approximately six months before the trial was scheduled to begin. It clearly outlined the dates that certain pretrial matters would be addressed, including pretrial motions and depositions. At that time, plaintiff was represented by counsel who agreed with the order. Her refusal to continue the matter did not present an insurmountable barrier to the success of plaintiff's case. The hearing justice was cognizant of the demands that would be placed upon plaintiff before trial. Accordingly, she took proactive steps to alleviate some of the burden placed on plaintiff because of D'Ambrosio's withdrawal. For example, the hearing justice relaxed the deadline for retaining experts, thereby allowing plaintiff to retain Drs. Regna and Reed. Thus, the hearing justice's handling of the scheduling of this case was not only reasonable, but also it was commendable.

Our ruling today is in accord with our decisions in which we have attributed error to a trial justice's decision to deny a motion for a continuance. In *Morra v. Harrop*, 791 A.2d 472, 478 (R.I.2002), we faulted the trial justice for failing to grant a short continuance after excluding expert testimony, thereby leaving the plaintiff's case vulnerable to judgment as a matter of law. Specifically, we ruled that "when faced with the *unexpected* and premature termination of litigation, it is incumbent upon the trial justice to grant a reasonable continuance or consider an involuntary dismissal, or non-suit, and to set forth his or her reasons for denying the same." *Id.* (Emphasis added.) In that case, the trial justice's exclusionary ruling came on the fifth day of trial. *See id.* at 478. More importantly, however, the defendant in *Morra* moved for a continuance when the trial justice made his ruling. *See id.* at 476.

Conversely, plaintiff here challenges a motion for a continuance that she filed more than one month before the trial commenced. Unlike the defendant in *Morra*, plaintiff had the opportunity to take appropriate action in response to the hearing justice's ruling. Thus, our decision in

*Morra* has no impact on the hearing justice's ruling on this matter.

Although plaintiff does not challenge the hearing justice's refusal to grant her request for a continuance that she made during Dr. Regna's testimony at the *Daubert* hearing, we will briefly address that matter in light of *Morra*. Although the hearing justice's exclusion of plaintiff's experts effectively ended the litigation, her refusal to grant a continuance did not constitute reversible error in this case. Here, the hearing justice's ruling should not have been wholly *unexpected* by plaintiff, as it was in *Morra*. *See Morra,* 791 A.2d at 478. Indeed, plaintiff initially sought to replace Dr. Regna with another "expert" out of concern over his ability to properly testify at trial. Moreover, the trial justice already had granted summary judgment in favor of Weisberg for lack of sufficient evidence about causation. After the hearing justice ultimately excluded the testimony of Drs. Reed and Regna, plaintiff never renewed her request for a continuance. Thus, to assign reversible error to a hearing justice's failure to continue a trial under these circumstances would provide litigants with an ongoing entitlement to a continuance whenever the matter proceeded to trial in spite of an expert's known shortcomings.

## V

### Expert Testimony

The plaintiff next argues that the hearing justice erred in excluding the testimony of her two experts, Drs. Reed and Regna, after the *Daubert* hearing. Rule 702 of the Rhode Island Rules of Evidence governs the admission of expert testimony in Rhode Island courts. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

 In *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480, the United States Supreme Court announced that all scientific evidence must be relevant as well as reliable pursuant to the Federal Rules of Evidence. Specifically, the trial justice must regulate the admission of scientific evidence to ensure that the proposed scientific testimony "rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485. In carrying out this regulatory duty, the trial justice "exercises a gate keeping function." *DiPetrillo,* 729 A.2d at 685. Those gatekeeping duties apply "not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238, 246 (1999). We have recognized the applicability of *Daubert* and *Kumho Tire* to situations in which scientific evidence is offered pursuant to the Rhode Island Rules of Evidence. *See Raimbeault v. Takeuchi Manufacturing, (U.S.), Ltd.,* 772 A.2d 1056, 1061 (R.I.2001).

This Court has offered clear guidance on the standard for admitting complex and/or scientific evidence. "[S]cientific expert evidence is admissible only if it is 'relevant, appropriate, and of assistance to the jury.'" *Id.* (quoting *DiPetrillo,* 729 A.2d at 686). An individual need not hold a particular license, title or certificate in a specialized field to testify as an expert; he or she need only possess " 'knowledge, skill, experience, training, or education' [that] can deliver a helpful opinion to the fact-finder." *Id.* (quoting *Owens v. Payless Cashways, Inc.,* 670 A.2d 1240, 1244 (R.I.1996)).

However, the expert opinion is admissible only if it is based on scientifically valid methodologies or principles and is sufficiently tied to the facts at issue in the case. See DiPetrillo, 729 A.2d at 689–90.

■■■ In assessing the validity of a purported expert's opinion, the hearing justice should consider factors such as: the extent to which the proffered knowledge can or has been tested; whether the underlying theory or technique has been subjected to peer review and publication; the known or potential rate of error; whether the theory or technique generally is accepted in the scientific community; whether the opinion has been developed for the purpose of testifying; and the qualifications of the expert. See id. at 689. Once the validity and relevance of the expert testimony have been established, the testimony should be submitted to the trier of fact. Id. at 690. " 'This Court will not disturb a trial justice's ruling on the admissibility of expert testimony absent an abuse of discretion.' " Raimbeault, 772 A.2d at 1061.

In Raimbeault, this Court affirmed a trial justice's exclusion of a witness's testimony on the grounds that the witness did not have the necessary "knowledge, skill, experience, training, or education" required to testify as an expert under Rule 702. Raimbeault, 772 A.2d at 1062. Further, his proffered testimony was not "relevant, appropriate, [or] of assistance to the jury." Id. (quoting DiPetrillo, 729 A.2d at 686). In that case, the plaintiff presented Marc Richman (Richman) to testify about a design defect in a piece of excavating equipment that allegedly caused the plaintiff's personal injuries. See id. According to Richman, the machine was flawed because it did not sufficiently protect users from human error. See id. However, Richman, a retired engineering professor with a doctor of science from the Massa-

chusetts Institute of Technology, had no experience designing machinery similar to the one at issue in that case. See id. Further, he never had designed a warning for a commercially marketed product. See id. Moreover, Richman had no training or experience in the area of human factors. See id. Finally, he failed to disclose a scientifically valid basis for his opinion that the excavator machine was unreasonably dangerous. See id. Thus, Richman's testimony was appropriately excluded.

■■■ We are of the opinion that the hearing justice's decision to close the gates on the experts' testimony in this case was consistent with our decision in Raimbeault. Doctor Reed's testimony was not " 'relevant, appropriate, [or] of assistance to the jury.' " Raimbeault, 772 A.2d at 1062. He failed to demonstrate that his conclusion about the nature and concentration of the chemicals emitted from the carpet was the product of scientifically valid theories and methodologies. Although Dr. Reed did not actually test the carpet in plaintiff's office, he had tested other similar carpets. Applying a scientific model to the tests of the other carpets, Dr. Reed concluded that the carpet in plaintiff's office emitted a certain quantity of hexane. He acknowledged, however, that he was the only person to have used the model to test carpeting. Doctor Reed further testified that the theory and methodology of using the model to test carpeting had never been subjected to peer review. Although he referred to another doctor's approval of his methodology, Dr. Reed specifically testified that the use of the model in this manner does not enjoy general acceptance in the scientific community. Based on the factors enunciated in DiPetrillo, the hearing justice appropriately excluded Dr. Reed's testimony.

■■■ The hearing justice also excluded Dr. Regna's testimony, concluding that he

was not qualified to testify as an expert and further, that his opinion about the causal relationship between the allegedly toxic chemicals in the carpet and plaintiff's injuries was not scientifically valid. Referring to Dr. Regna's qualifications to testify as an expert, the hearing justice noted that, although Dr. Regna had been employed as a consulting medical toxicologist for eighteen years, he had worked on only twenty cases in that time. Further, there was no evidence that Dr. Regna had any particular expertise in the area of hexane emissions. These facts fully support the hearing justice's skepticism of Dr. Regna's expertise.

Moreover, it is difficult to envision a more scientifically invalid opinion than the one Dr. Regna offered in this case. When asked about the level of hexane that plaintiff was exposed to, he said that he was able to calculate the amount based on Dr. Reed's testimony. Doctor Reed testified that 55 percent of the carpets that he tested revealed the presence of hexane. But Dr. Regna interpreted Dr. Reed's testimony to mean that hexane constituted 40–60 percent of the emissions from the tested carpets. Based on that amount, Dr. Regna calculated the dose of hexane that plaintiff was exposed to. It is clear that Dr. Regna's misinterpretation of Dr. Reed's testimony made his conclusion invalid. Accordingly, the hearing justice did not abuse her discretion in excluding Dr. Regna's "expert" testimony.

## VI

### Rule 50

The plaintiff also argues that the hearing justice erred by granting defendants' Rule 50 motion for judgment as a matter of law. *See* Rule 50. Pursuant to Rule 50(a)(1), a hearing justice presiding over a jury trial may grant a party's motion for judgment as a matter of law after "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." When ruling on a Rule 50 motion, the trial justice "considers the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draws from the record all reasonable inferences that support the position of the nonmoving party. * * * If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." *Mellor v. O'Connor*, 712 A.2d 375, 377 (R.I.1998) (quoting *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I.1996)). In reviewing a trial justice's decision on a motion for judgment as a matter of law, this Court is bound by the same rules and standards as the trial justice. *Id.*

In reviewing the propriety of the hearing justice's grant of defendants' Rule 50 motion for judgment as a matter of law, it is apparent that the ruling was made at an inappropriate point in the proceedings. "Rule 50 * * * may be asserted only during or after a trial." *Kevorkian v. Glass*, 774 A.2d 22, 24 (R.I.2001). A jury trial commences when jeopardy attaches, that is, when the jury is sworn. *See State v. Francis*, 719 A.2d 858, 859 (R.I.1998) ("[i]n a jury trial, jeopardy attaches when the jury is empaneled and sworn"). Here, defendants moved for judgment as a matter of law immediately after the pretrial *Daubert* hearing. At that point in the proceedings, the jury had not yet been empaneled, the parties had not presented opening statements and no witnesses had testified before the jury. Consequently, the hearing justice prematurely granted

judgment as a matter of law pursuant to Rule 50.

 We suggest that a better practice when seeking to exclude all evidence of a necessary element of a cause of action in a pretrial *Daubert* hearing would be to join the request for the hearing with a motion for summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure. Although we conclude that Rule 50 was the improper vehicle for disposing of the plaintiff's claims, that error was harmless in this case. To succeed on her personal injury claims, it was incumbent on the plaintiff to establish a causal connection between the carpet and her alleged injuries. As discussed, this connection was properly proven by expert testimony. Further, the validity of this expert evidence had to be tested in a *Daubert* hearing. *See DiPetrillo*, 729 A.2d at 686 ("[s]uch hearings would address any genuine issue of the validity of the scientific theory to be applied in cases * * * in which evidence of toxicology * * * may be presented"). In this case, it was obvious to the trial justice and counsel that the plaintiff was unable to present any expert evidence to support her claim.

### Conclusion

For the foregoing reasons, the plaintiff's appeals are denied and dismissed. The judgment of the Superior Court is affirmed. The papers in the case may be returned to the Superior Court.

Justice FLAHERTY did not participate.