**Richard TYRE and Lisa Tyre, as natural parents and heirs of Shelley Arden Tyre**

v.

**David SWAIN, individually and as executor of the estate of Shelley Arden Tyre.**

**No. 2006–183–Appeal.**

Supreme Court of Rhode Island.

May 13, 2008.

J. Renn Olenn, Esq., Warwick, Julie Olenn, Esq., pro hac vice, for Plaintiff.

Anthony R. Leone, Esq., for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

# OPINION

Chief Justice WILLIAMS, for the Court.

After years without closure with respect to their daughter's untimely death, the plaintiffs, Richard and Lisa Tyre (collectively plaintiffs), in their capacity as natural parents and heirs of Shelley Arden Tyre, filed this wrongful death action against the defendant, David Swain (defendant).[1] The jury returned a verdict in favor of the plaintiffs, and a judgment was entered declaring that the defendant was a slayer, pursuant to G.L. 1956 § 33–1.1–1(3), and awarding the plaintiffs compensatory damages, with interest, totaling $2,815,085.46 and punitive damages of $2 million, from which judgment the defendant appeals. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

1. Lisa Tyre was added as a plaintiff by a later-amended complaint.

## I
### Facts and Travel

On March 12, 1999, Shelley Arden Tyre (Shelley), formerly of Jamestown, died while scuba diving off the coast of Tortola in the British Virgin Islands. More than a week later, her husband, defendant, returned to the United States and visited plaintiffs, Shelley's parents, to inform them that he did not know what had happened to Shelley but that he was not diving with her when she drowned.

On March 5, 2002, plaintiffs filed a complaint against defendant in Superior Court in their capacities as Shelley's natural parents and as her heirs. The three-count complaint alleged that defendant (1) was a slayer, pursuant to § 33–1.1–1(3); (2) caused Shelley's wrongful death; and (3) should be subject to civil liability for a criminal act, pursuant to G.L. 1956 § 9–1–2.

Over the next four years, various hearings on pretrial motions and scheduling conferences took place before the trial justice to address the status of defendant's counsel and the trial start date.

The defendant initially was represented by an attorney who handled various matters before the probate court (the probate attorney). Although defendant's probate attorney also entered her appearance in this wrongful death action, she eventually realized that the case was beyond her level of expertise and it was necessary to engage an experienced trial attorney for this complex litigation. With his probate attorney's assistance, defendant retained a trial attorney, who entered his appearance on defendant's behalf in June 2003. Subsequently, however, defendant's trial attorney became seriously ill and was court-excused. Finally, in June 2004, defendant's probate attorney sought to withdraw from representing defendant in the wrongful death action, explaining that she was reluctant to continue representing defendant given her lack of significant trial experience. During a hearing on the motion, the probate attorney further explained that the trial attorney had been defendant's lead trial counsel in the action for the past year and she was not comfortable about taking the lead role in the case. She would, however, continue to represent defendant in the probate matters. Although he was court-excused, defendant's trial attorney appeared at the hearing and stated that he intended to continue as defendant's counsel when he physically was able to do so. The trial attorney was unable to predict precisely when he would be able to return to work, but he remained optimistic and, in light of his doctors' estimations, believed he could resume full-time work on the case in September 2004. The trial justice denied the probate attorney's motion, expressing her concern that allowing the probate attorney to withdraw while the trial attorney was court-excused could result in the proceedings being stayed indefinitely, especially if the trial attorney's condition did not improve. The trial justice did, however, advise defendant to seek alternate counsel if his trial attorney's condition did not improve.

In August 2005, plaintiffs filed a motion to assign the case for a trial date certain. At a hearing on the motion the trial justice indicated her respect for defendant's desire to have his trial attorney represent him, but believed it was necessary to balance that interest with plaintiffs' interest in an accelerated disposition of their case.[2] The trial attorney informed the court that

---

**2.** *See* G.L. 1956 § 9–2–18 (requiring the acceleration of causes of action brought by plaintiffs sixty-five years of age or older) and § 9–2–20 (requiring the acceleration of actions for wrongful death and other actions involving damages in excess of $100,000).

he was feeling better in March 2005 and was present for depositions in Tortola that month. However, while in Tortola, his condition worsened and he underwent additional complex surgery in April 2005. With the status of his health uncertain, he informed the court that he was not sure when he would be able to resume working on the case, but was committed to doing so if his health improved.

The trial justice again advised defendant to consider alternate counsel. "The idea of Mr. Swain having to find different trial counsel is no shock here," she noted. "I don't know to what extent you communicated that to him. I'm certainly not going to second guess his judgment for not looking for different trial counsel that long ago, but I think we all have been able to see that the history of [the trial attorney's] illness has been such that we just don't know where it's going. I can't keep doing this. I need to try this case soon." Concerned that continuing the case any more would infringe on plaintiffs' rights, the trial justice assigned the case for trial on October 25, 2005.

In October 2005, defendant moved to stay the start of trial. The defendant's trial attorney informed the court that he was physically unable to represent defendant. He suggested that defendant had two potential attorneys willing to represent him, but both would need an extension of the trial date to prepare. The trial justice, however, expressed the view that defendant was responsible for failing to secure alternate counsel sooner. "This is about Mr. Swain and his failure to see the handwriting on the wall, his failure to take reasonabl[e] and necessary precautions by finding substitute or even co-counsel that can try the case a long time ago," she said. Therefore, the trial justice denied defendant's motion for a stay of the trial proceedings.

The defendant petitioned this Court for a writ of certiorari to review the trial justice's denial of defendant's motion to stay the trial proceedings, which this Court granted. Almost immediately thereafter, defendant filed for bankruptcy, automatically staying all proceedings in this action. Therefore, this Court dismissed defendant's petition for a writ of certiorari as moot.

After the bankruptcy court stay was lifted, the trial justice held a scheduling conference in December 2005. At that time plaintiffs requested a trial date. Meanwhile, both of defendant's attorneys filed motions to withdraw, which the trial justice granted, subject to the attorneys' completion of some general housekeeping matters. The trial justice also informed defendant that he could request a continuance, but that she was not inclined to grant it.

"THE COURT: As I said I think this should have happened a long time ago. I want to make sure you understand the status of this. At this point I'm going to be moving onto scheduling the trial and that's going to be fairly soon. Do you understand all of that?

" * * *

"MR. SWAIN: Yes."

After defendant candidly informed the trial justice that he did not intend to present a defense at trial, the trial justice scheduled the trial for February 13, 2006.

The following facts were developed at trial.

In March 1999, Tyre and her husband, defendant, a scuba shop owner and dive instructor, were vacationing on the island of Tortola with their friends Christian and Bernice Thwaites, and the Thwaites's nine-year-old son, Matthew. The two families chartered a yacht and spent the week traveling to various sites off the coast of Torto-

la, where they dived once or twice a day. Because Matthew was not diving on the trip, the couples agreed to dive in pairs so that Matthew would not be alone on the boat.

On the last full day of their vacation, the group traveled to a dive site known as the Twin Wrecks. Shelley and defendant dove first. When defendant returned thirty to forty minutes later, Christian finished putting on his scuba gear and entered the water.

After descending approximately eighty feet, Christian reached the sea bed and swam toward the wrecks. As he approached the wrecks, he noticed a yellow fin embedded in the sand and recognized that it belonged to Shelley. Believing that Shelley would be happy that Christian found her fin, he picked it up, intending to return it to her. Continuing on to the wrecks, Christian saw Shelley twenty to thirty feet away. She was on her back with her face pointing toward the surface of the water. Her eyes were open and her scuba mask was missing. Alarmed, Christian swam rapidly toward Shelley, inserted his spare regulator into her mouth to prevent her from taking in more water, and began to ascend with her. When they reached the surface, Christian immediately shouted in the direction of the boat that there was an emergency. While still in the water, he began to administer mouth-to-mouth resuscitation on Shelley. The defendant navigated a tender boat toward Christian and Shelley and, upon reaching them, pulled Shelley up from the water and into the boat. The defendant attempted to resuscitate his wife once or twice using cardiopulmonary resuscitation (CPR), but he stopped after making two pushes. Christian tried again to resuscitate Shelley, administering both CPR and mouth-to-mouth resuscitation, but he stopped when defendant told him "Shelley's gone. It's over." Christian explained that he followed defendant's instruction, believing that defendant, a former EMT, was medically qualified to assess the situation and had the moral high ground with respect to his wife.

Upon returning to the main boat, Christian went to call mayday, an internationally recognized maritime distress signal, over the emergency radio channel, but defendant thwarted his efforts. The defendant told Christian that he "[did not] want everybody coming around." Instead, defendant used his cellular phone to call the dive rescue team, which sent a boat out to the yacht to pick up Shelley.

Christian, an experienced diver, testified that less than one-third of the air in Shelley's tank was used during her dive and that there were no bite marks on her regulator, which presumably would be present if Shelley had suffered a violent reaction. Based on his observations of Shelley's equipment, he believed that it was in good working order and that 2,200 pounds per square inch (PSI) of air remained in her dive tank. As part of his professional training, Christian knew that he had to bring Shelley's equipment to a trained technician as soon as possible to determine whether it had malfunctioned.

Christian immediately delivered the gear to Phillip Brown, an advanced scuba diver and owner of Aquaventure Scuba Services, Limited, in Tortola. Brown, who is certified to inspect tanks and to service regulators and buoyancy compensators, checked the air pressure in the tank, verified that the regulators were breathable, and confirmed that the buoyancy compensator would inflate and deflate appropriately. The morning after Shelley's death, Brown visited the wreck site, where he recovered Christian's camera and a swim fin, mask, and snorkel.

Brown also testified that, several days after the incident had occurred defendant came by his shop and instructed him to get rid of Shelley's equipment. The defendant told Brown that he could give it to a deserving local citizen. Brown also testified that defendant informed him that it was taking a long time for the British Virgin Islands government to perform an autopsy on Shelley, and he asked whether there was any way that Brown could help expedite the process. Brown testified that defendant also inquired about whether he could speak with the medical examiner before the autopsy was conducted, expressing his concern that the medical examiner would be unfamiliar with dive accidents. On a separate occasion, defendant stopped by Brown's shop and informed him that the autopsy showed nothing more than death by drowning. He again instructed Brown to dispose of the dive gear.

Growing concerned about the unusual circumstances of Shelley's death, Brown contacted the investigating officers in Tortola. Brown prepared a report for the authorities in which he ruled out many of the common causes of diving injuries. Brown was unaware of any drowning incidents occurring during his twelve years on the island. Brown estimated that between 2,000 and 3,000 divers visit the Twin Wrecks each year, and no incidents or injury has resulted from those dives. Brown testified that in his mind, one training exercise taught to divers in rescue-diver courses could have caused Shelley's death. Brown testified that the panicked-diver control maneuver is an exercise to control a panicked diver from ascending too quickly to the surface. The rescue diver approaches the person from behind, pinches his or her tank between the rescue diver's legs, and holds onto the steel valve at the top of the tank. This technique gives the rescue diver a certain level of control while preventing the panicked div-

er from inflicting any injury upon the rescue diver's body. In Brown's estimation, while in this position, the rescue diver would have had access to the tank air valve and could have shut off the diver's air by turning that valve seven to nine times. Although Brown reported this information to the investigating officers, he heard nothing more from them about the investigation.

Doctor Bruce Hyma, chief medical examiner for Dade County in Miami, Florida, testified that some of Shelley's equipment was broken when it was recovered from the dive site, indicating that she endured a violent struggle. According to Dr. Hyma, when Shelley's fin was recovered, the heel strap was bent backwards, indicating that a struggle had occurred. He further believed that Shelley's body was towed into the area of the wreck where she was found because there virtually was no current in the area. Doctor Hyma also testified that the damage to Shelley's mask indicated that force was applied to it in an abnormal way. In his professional opinion, some type of "terminal violence occurred that deprived her of her air supply to the point where she would go unconscious and then would die as a result of being submerged in the ocean." He opined that she died by "homicidal drowning."

Bill Oliver, a scuba products engineer, reached the same conclusion as Dr. Hyma. Oliver testified that the position of Shelley's fin in the sandy sea floor, the fact that her mask was damaged, and the fact that the mouthpiece to her snorkel was missing, led him to believe some type of external force had caused these events. Craig Jenni, a dive and marine accident investigator, testified that it was unlikely that Shelley had suffered from air decompression sickness.

Testimony at trial also delved into the circumstances of the marriage between defendant and Shelley, as well as their financial status. Shortly before Shelley's death, she was in the process of leaving her position as principal at Thayer Academy in Braintree, Massachusetts. While defendant was away on a dive trip, Shelley was offered a lesser-paying position at Rocky Hill School in Rhode Island. Unable to reach her husband to discuss the opportunity with him, Shelley decided to accept the job. She hoped that taking a position closer to home would help her marriage, but she knew that this also would be a financial strain for the couple because she was their primary source of income. During this time, defendant was operating a dive shop, but the business was less than profitable. Shelley continually funneled money into the business to keep the operation and defendant's dream afloat.

Finally, plaintiffs introduced a redacted copy of Shelley's last will and testament into evidence. Her estate planning attorney testified that, under Shelley's will, defendant would be entitled to all of Shelly's estate upon her death. That attorney also testified that he had prepared an antenuptial agreement for Shelley before her marriage to defendant; that agreement provided that defendant would receive nothing if their marriage ended in divorce.

For his part, defendant had very limited participation at trial. He attended few of the trial days, opted against cross-examining any witnesses, and initially informed the trial justice that he would not be presenting a defense at all.

However, after the trial was underway, defendant made an appearance and moved to dismiss the Slayer's Act count of plaintiffs' complaint on the grounds that it does not give rise to an independent cause of action. The trial justice continued the motion until the end of the trial, at which time she took up the motion again and denied it. The trial justice agreed with defendant that § 33–1.1–1(3) did not give rise to an independent cause of action, but she explained that a jury determination was necessary concerning whether plaintiffs had proved by a preponderance of the evidence that defendant intentionally killed Shelley with malice aforethought, so that the trial justice then could make a declaration about whether defendant is a slayer within the meaning of the statute.

At the conclusion of plaintiffs' case, defendant's position with respect to defending his case changed, and he presented one witness, his daughter, in his defense.

Jennifer Swain, defendant's then thirty-year-old daughter from a previous marriage, testified at trial. She told the jury that defendant had no history of violence and that she had "never seen [him] lay a finger on anyone or even think about it." She described her father as "one of the most peaceful people [she knew]." She testified that her father was "tearful and angry at the world and at the ocean, at God," when he informed her of Shelley's death.

After less than three hours of deliberations, the jury returned a verdict in favor of plaintiffs on all counts. The jury found by a preponderance of the evidence that defendant intentionally had killed Shelley with malice aforethought, and it awarded plaintiffs compensatory damages with interest totaling $2,815,085.46 and punitive damages of $2 million. The defendant moved for a new trial, which was denied, and defendant timely appealed.

## II

### Analysis

On appeal, defendant urges this Court to reverse the judgment of the Superior Court and remand this case for a new trial.

As support for this request, defendant argues that (1) the Superior Court lacked subject-matter jurisdiction to determine whether defendant was a slayer under § 33–1.1–1(3); (2) the trial justice erred in refusing to grant him a continuance to obtain new counsel; (3) the trial justice erred in allowing punitive damages in a wrongful death action; (4) the trial justice erred in allowing a single verdict for judgments; and (5) the trial justice erred in *sua sponte* ordering compensatory damages, even though plaintiffs did not request such relief.

## A

## Jurisdiction

■ The defendant first argues that the Superior Court lacked subject-matter jurisdiction to declare him a slayer under the Slayer's Act, chapter 1.1 of title 33. Section 33–1.1–1(3) defines a slayer as, "any person who willfully and unlawfully takes or procures to be taken the life of another." Section 33–1.1–3 also provides that a slayer "shall be deemed to have predeceased the decedent as to property which would have passed from the estate of the decedent to the slayer under the statutes of descent and distribution, or by statutory right as surviving spouse." Importantly, by contrast with the state of the law in some jurisdictions, Rhode Island's Slayer's Act does not require a criminal conviction for a person to be declared a slayer.

According to defendant, the probate court is vested with the exclusive jurisdiction to determine whether an individual is a slayer. For their part, plaintiffs assert that this case falls squarely within the Superior Court's jurisdiction pursuant to the Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9 (the UDJA).

■ As a general matter, "a claim of lack of subject matter jurisdiction may be raised at any time." *Pollard v. Acer Group*, 870 A.2d 429, 433 (R.I.2005) (citing *LaPetite Auberge, Inc. v. Rhode Island Commission for Human Rights*, 419 A.2d 274, 280 (R.I.1980) and Rule 12(b)(1) of the Superior Court Rules of Civil Procedure). This Court reviews *de novo* whether a court has subject-matter jurisdiction over a particular controversy. *Newman v. Valleywood Associates, Inc.*, 874 A.2d 1286, 1288 (R.I.2005).

Under Rhode Island law, probate courts are statutorily vested with jurisdiction over the probate of wills, G.L. 1956 § 8–9–9, whereas the Superior Court "may exercise general probate jurisdiction in all cases brought before it on appeal from probate courts, or when such jurisdiction is properly involved in suits in equity." G.L. 1956 § 8–2–17.

Notwithstanding these statutory provisions, the UDJA also vests the Superior Court with jurisdiction to make declarations with respect to probate matters. Section 9–30–4 of the UDJA expressly provides the following:

"Any person interested as or through an executor, administrator, trustee, guardian, or other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust, in the administration of a trust, or of the estate of a decedent, an infant, person who is mentally incompetent or insolvent, may have a declaration of rights or legal relations in respect thereto:

"(1) To ascertain any class of creditors, devisees, legatees, heirs, next of kin, or others;

"(2) To direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity; or

"(3) To determine any question arising in the administration of the estate or

trust, including questions of construction of wills and other writings."

Although the complaint in this case does not expressly state that plaintiffs are seeking relief pursuant to the UDJA, there can be no question that plaintiffs were seeking a declaration that defendant was a slayer, which would disqualify him as a beneficiary of Shelley's estate.[3] Indeed, when defendant moved to dismiss the Slayer's Act count of plaintiffs' complaint, the trial justice informed both parties that, although the Slayer's Act itself does not give rise to an independent cause of action, the jury had to make a determination about defendant's status under the statute so she then could make a declaration about whether he was a slayer. Furthermore, after the jury reached its verdict, the trial justice again explained that she was declaring defendant a slayer based on the jury's determination that defendant killed his wife with malice aforethought. "[T]his is just a declaration of status as far as I am concerned," she informed the parties. "It's going to be up to the Probate Court to figure out what to do with that definition after this," she continued.

Importantly, because Rhode Island's Slayer's Act may apply in the absence of a criminal conviction, a civil proceeding is necessary to determine whether defendant willfully or unlawfully took or procured Shelley's life. *See* Mary Louise Fellows, *The Slayer Rule: Not Solely a Matter of Equity*, 71 Iowa L.Rev. 489, 501 (1986) ("Most jurisdictions now agree that the better rule is to allow the civil courts to litigate the issue of culpability when criminal proceedings do not result in a conviction for a felonious and intentional killing."). A defendant, if he or she desires, is entitled to a jury finding with respect to his or her status as a slayer, which the probate court cannot provide. We therefore conclude that, once the Superior Court has made a declaration under the UDJA with respect to whether a defendant is a slayer it then is within the province of the probate court to determine what effect, if any, that declaration has on the distribution of the decedent's assets under a will or other instrument.

## B

### Continuance

The defendant next alleges that the trial justice abused her discretion by failing to grant defendant a continuance to secure counsel before the trial started. The plaintiffs, however, contend that defendant never requested a continuance of the February 2006 trial date and, therefore, waived the issue.

Despite defendant's contention that the trial justice erred in denying his motion for a continuance, at no time during this proceeding or before the trial started did defendant request a continuance of the February 2006 trial date. The defendant did, however, move for a new trial, alleging *inter alia*, that he was prejudiced by proceeding to trial without counsel. Denying his motion, the trial justice made clear that defendant was well apprised of the fact

---

**3.** The defendant also argues that, if the case did, in fact, proceed under the Uniform Declaratory Judgments Act, that act requires all interested parties to be named in such an action. General Laws 1956 § 9–30–11 provides that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration * * *." Although defendant protests that his children should have been named in the action, we fail to see that they would be "affected by the declaration" concerning defendant's status as a slayer. The trial justice in no way was considering their rights as contingent beneficiaries, nor do we express an opinion with respect to their rights, if any.

that his attorneys were withdrawing and made no effort to timely secure alternate counsel.

■ This Court continually has affirmed that we "will not review issues that are raised for the first time on appeal." *Richard v. Richard*, 900 A.2d 1170, 1178 (R.I. 2006) (quoting *In re Amber P.*, 877 A.2d 608, 619 (R.I.2005)). "Our well settled raise-or-waive rule prevents us from addressing arguments not raised before the trial justice." *Id.* (quoting *State v. Mohapatra*, 880 A.2d 802, 810 (R.I.2005)).

As illustrated by the history of this case, defendant moved to continue the trial in October 2005; this motion was denied. After the trial justice denied this initial motion, defendant petitioned this Court for a writ of certiorari. That petition later was deemed moot because defendant filed for bankruptcy, effectively staying the trial. After the conclusion of the bankruptcy proceedings, plaintiffs requested that the trial justice set a trial date. At that same hearing, the trial justice granted defendant's attorneys' motions to withdraw. The defendant did not move for a continuance at this point or at any point after that.

■ Even had defendant properly preserved this issue for appeal, it is well settled in this jurisdiction that "[a] trial justice is vested with great authority in managing his or her trial calendar." *Bergeron v. Roszkowski*, 866 A.2d 1230, 1235 (R.I.2005) (quoting *Mills v. State Sales, Inc.*, 824 A.2d 461, 469 (R.I.2003)). In light of our recognition that "[t]he management of a trial calendar is among the most difficult of all judicial assignments" we afford the "widest discretion * * * to calendar justices and trial justices in carrying out this enormously difficult function." *Id.* (quoting *Mills*, 824 A.2d at 469). Therefore, "[t]his Court will not disturb a trial justice's decision to grant or deny a re-

quest for a continuance absent an abuse of discretion." *Id.* (quoting *Mills*, 824 A.2d at 469).

■ Affording the trial justice the deference she is due, we cannot conclude that her decision to press forward with the trial was an abuse of discretion. On numerous occasions the trial justice urged defendant to seek alternate counsel, because it seemed very unlikely that either of his attorneys would be able to try his case. In addition to protecting defendant's interest in having trial counsel to assist in his defense, the trial justice also had a duty to balance plaintiffs' interest in an accelerated trial of their wrongful death claim, to which they were entitled under Rhode Island law. *See* G.L. 1956 § 9–2–18 (requiring the acceleration of causes of action brought by plaintiffs sixty-five years of age or older) and § 9–2–20 (requiring the acceleration of actions for wrongful death and other actions involving damages in excess of $100,000).

Having properly balanced both of these interests, the trial justice concluded that defendant was well apprised of the fact that he might be without counsel and made little effort to obtain counsel who could take over his case without requesting yet another continuance. This was not an abuse of discretion.

## C

### Punitive Damages

■ The defendant next contends that the trial justice erred by permitting punitive damages with respect to plaintiffs' claim of civil liability for a criminal act pursuant to § 9–1–2. The defendant notes that plaintiffs' action essentially was for Shelley's wrongful death and, because punitive damages are not permitted in wrongful death actions, they are inappro-

priate in this case. He also argues that § 9–1–2 does not specifically authorize the imposition of punitive damages nor would punitive damages be appropriate given that the nature of the cause of action is remedial, not punitive.

The plaintiffs respond that defendant did not interpose an objection at trial with respect to the punitive damages issue and has, therefore, waived that issue on appeal.

■■■ "It is axiomatic that [this Court] will not entertain on appeal an issue that the aggrieved party did not specifically raise before the trial court." *State v. Stierhoff*, 879 A.2d 425, 431 (R.I.2005) (quoting *Town of Richmond v. Wawaloam Reservation, Inc.*, 850 A.2d 924, 930 (R.I. 2004)). "Thus, a 'litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal.'" *Id.* at 434 (quoting *State v. Grant*, 840 A.2d 541, 546 (R.I.2004)). This is particularly true of jury instructions. "In order to properly preserve an objection to a particular jury instruction, a party must distinctly state the matter to which the party objects and the grounds for that objection before the jury begins its deliberation." *Mead v. Papa Razzi*, 899 A.2d 437, 443 (R.I.2006) (citing Super. R. Civ. P. 51(b)).

Although defendant took issue with the jury's award of punitive damages in his motion for a new trial, this was the first time he raised such an objection. The defendant did not object to the trial justice's jury instructions on punitive damages nor did he object at a later hearing on the motion for a new trial when the trial justice explained that punitive damages would apply to the § 9–1–2 claim. Because defendant remained silent throughout trial and failed to object to the trial justice's instructions with respect to punitive damages, he deprived the trial justice of the opportunity to respond to any alle-gation of error. Therefore, this issue is not properly before this Court on appeal.

## D

### Single Judgment

■■■ The defendant also argues that the trial justice erred by entering a single judgment for plaintiffs' wrongful death claim. The defendant contends that the jury should have been instructed to render a separate verdict with respect to economic loss damages and survival damages for pain and suffering.

Rhode Island's Wrongful Death Act, G.L. 1956 chapter 7 of title 10, sets forth two separate causes of action. Section 10–7–1 provides for recovery for the death itself, whereas § 10–7–5 and § 10–7–7 provide for survival damages, which includes damages for medical expenses, lost earning capacity until the time of death, pain and suffering. Importantly, § 10–7–10 and § 10–7–2 make clear that damages for the wrongful death itself shall be awarded to the decedent's next of kin and not to the estate itself. However, § 10–7–6 provides that survival damages shall be awarded to the estate itself for proper distribution thereafter.

According to defendant, combining the compensatory damages award for plaintiffs' wrongful death and survival claims prejudiced his children, Jennifer and Jeremy Swain, who are named as contingent beneficiaries in Shelley's will. The defendant argues that the Slayer's Act operates to exclude him from inheriting under Shelley's will, pursuant to § 10–7–6, and that survival damages would pass through Shelley's estate to Jennifer and Jeremy as contingent beneficiaries.

■■■ At the outset, we pause to note our concern over the fact that these plaintiffs were permitted to maintain an action

for survival damages. Section 10-7-6 specifies that actions for survival damages may be maintained only by the executor or administrator of the decedent's estate. Nevertheless, defendant never challenged plaintiffs' capacity to maintain this action.

Instead, the trial justice proceeded to instruct the jury with respect to both wrongful death and survival damages. Although she instructed the jury with respect to both types of damages, the trial justice failed to ask the jury to distinguish between the two types of damages in their verdict. The defendant did not object to any of the trial justice's instructions, even though he was offered an opportunity to raise any objections, and the jury returned a verdict setting forth a single award of compensatory damages for wrongful death. Our review of the record reveals that the first time defendant attempted to inform the trial justice of this error was in his motion for a new trial, in which he informed the trial justice that he was concerned that the award of Shelley's entire probate estate to her parents disenfranchised his children, who were named as contingent beneficiaries under Shelley's will.

Rule 51(b) of the Superior Court Rules of Civil Procedure specifies the protocol for objecting to a trial justice's instruction to the jury. Rule 51(b) provides, in relevant part, that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." We cannot emphasize enough the importance of making a timely objection to the jury instructions before the jury deliberates. "As we have frequently pointed out, Rule 51(b) 'bars a party from challenging an erroneous instruction unless [the party] lodges an ob-

jection to the charge which is specific enough to alert the trial justice as to the nature of [the trial justice's] alleged error.'" *Mead,* 899 A.2d at 443 (quoting *Majewski v. Porter,* 121 R.I. 757, 764–65, 403 A.2d 248, 252 (1979)). "Absent a sufficiently specific objection, the trial justice cannot be expected to divine the nature of counsel's objection." *Id.* at 444 (citing *Seabra v. Puritan Life Insurance Co.,* 117 R.I. 488, 503, 369 A.2d 652, 661 (1977)).

■ Furthermore, it is of no significance that defendant later attempted to assert the rights of the contingent beneficiaries in his motion for a new trial. The defendant contends that, pursuant to Rule 59 of the Superior Court Rules of Civil Procedure, he was entitled to challenge the legal concept reflected in the instruction even though he had not objected at the time that the instruction was given. The defendant's contention flies in the face of our long-standing rule that "jury instructions that are not objected to become the law of the case and are binding on both the jury and the trial justice when he or she passes on a motion for a new trial." *Sarkisian v. The NewPaper, Inc.,* 512 A.2d 831, 836 (R.I.1986); *see also Bajakian v. Erinakes,* 880 A.2d 843, 852 (R.I.2005) ("There having been no objection to this instruction, it became the law of the case and was binding upon the trial justice when he considered the motion for a new trial."); *Candido v. University of Rhode Island,* 880 A.2d 853, 856 (R.I.2005); *ADP Marshall, Inc. v. Brown University,* 784 A.2d 309, 316 (R.I.2001); *Zawatsky v. Cohen,* 463 A.2d 210, 212 (R.I.1983). We cannot fault the trial justice for denying defendant's motion for a new trial with respect to this error because she was bound by her instruction to the jury, which was the law of the case.

■ Although we believe that our law already is abundantly clear in this respect,

if any ambiguity remains in the minds of some, we now settle it once and for all. It is true that Rule 59 now permits alleged errors of law to be addressed in the context of a motion for a new trial. However, it would be a mistake to read that language as authorizing a party to raise an entirely new issue at the Rule 59 stage. Such a reading would be inconsistent with the venerable and frequently articulated principle that contentions not raised at trial are deemed waived. *See* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2809 at 94–99 (1995) (noting that in the federal court context, motions for a new trial frequently are denied because the legal rulings belatedly complained of were not objected to during the trial itself). What the present version of Rule 59 *does* authorize is a "Win this one for the Gipper" type of argument, in which counsel seeks to convince the trial justice of the soundness of a legal argument that counsel previously had made at a pre-verdict state of the trial. *See John Bartlett, Familiar Quotations: A Collection of Passages, Phrases and Proverbs Traced to their Sources in Ancient and Modern Literature* 674 (16th ed. 1992) (attributing "Win this one for the Gipper" to legendary coach Knute Rockne's inspirational reference to Notre Dame's first All–American football player, George Gipp).

■ We recognize that defendant elected to proceed *pro se* at trial, yet that decision does not excuse him from adhering to the procedural rules that govern what transpires in court. "Even if a litigant is acting pro se, he or she is expected to familiarize himself or herself with the law as well as the rules of procedure." *Sentas v. Sentas*, 911 A.2d 266, 271 (R.I. 2006) (quoting *Faerber v. Cavanagh*, 568 A.2d 326, 330 (R.I.1990)). The trial justice gave defendant ample opportunity to present any objections to the court before the jury began deliberating, at which time defendant assured the trial justice that he had no objections. Having waived the opportunity to raise such objections, defendant cannot now raise this argument on appeal.

Therefore, we will not interfere with the compensatory damages judgment entered in favor of plaintiffs in excess of $1.5 million (exclusive of interest).

### E

### Conformed Verdict

■ Finally, the defendant argues that the trial justice erred by *sua sponte* applying the compensatory damages award to the plaintiffs' § 9–1–2 claim as well as to their wrongful death claim. According to the defendant, the plaintiffs' complaint did not seek compensatory damages on its § 9–1–2 claim. As with the other arguments the defendant raises on appeal, the defendant failed to object on these grounds. Because the defendant failed to object to the application of compensatory damages to the § 9–1–2 count, he implicitly consented to the trial justice's action and cannot raise such an argument now on appeal.

### Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.