June 30, 2021

**Supreme Court**

No. 2018-346-Appeal.
(PC 17-2417)

Terrapin Development, LLC          :

                    v.                          :

Irene M. O'Malley Revocable Trust et   :
                    al.

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or  Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Terrapin Development, LLC      :

v.      :

Irene M. O'Malley Revocable Trust et   :
al.

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Long, for the Court.**  The plaintiff, Terrapin Development, LLC (Terrapin), appeals from a final judgment of the Superior Court denying its claim for specific performance of a purchase and sale agreement (PSA) in favor of the defendants, Irene M. O'Malley Revocable Trust and John P. Brady, Katherine Brady Walker, and Mary R. Brady, as Trustees of the Irene M. O'Malley Revocable Trust (collectively the Trust).  For the reasons stated herein, we affirm the judgment of the Superior Court.

**Facts and Procedural History**

In November 2016, Terrapin and the Trust entered into the PSA whereby Terrapin agreed to purchase nineteen lots comprising "Phase I" of a planned

- 1 -

subdivision in Cumberland, Rhode Island, known as Gold Rush Estates.  Under

Section 2.02, the PSA provided the terms of payment, including that Terrapin would

pay a portion of the sale price by granting the Trust a note secured by a

second-position mortgage of no more than $450,000, and subject to a first-position

mortgage not to exceed $1,340,000.[1]  Additionally, Section 6.03 of the PSA required

Terrapin to obtain, by February 24, 2017, certain approvals necessary for the transfer

of the property (the "permitting period"); it also required the Trust to cooperate with

Terrapin in obtaining those approvals and to reasonably extend the permitting period

if necessary.  Section 4.01 of the PSA set the closing for "the earlier of: (i) thirty

(30) days after the satisfaction of all conditions precedents set forth in [the PSA]

* * * or, (ii) February 24, 2017, which date shall be reasonably extended if necessary

from time to time in order for [Terrapin] to obtain the Permits[.]"  The PSA could

be amended only in writing with signatures from the buyer and seller, under Section

---

[1] Section 2.02 of the PSA states, in relevant part:

> "In order to induce the Seller into entering into this Agreement, * * * at or before the Closing (hereinafter defined), the Buyer shall execute:  (i) a promissory note in the amount of the Balance in favor of the Seller (the 'Promissory Note'); and, (ii) a mortgage securing the Promissory Note in favor of the Seller, which shall:  (a) be recorded in the second position behind any lender-first lien holder on the Property, the amount of said first lien not to exceed the sum of One Million, Three Hundred and Forty Thousand  ($1,340,000) Dollars[.]"

10.02. Notably, given the multiple requirements for time for performance to be extended "if necessary," the PSA did not contain a clause indicating that "time was of the essence" for the parties to complete their obligations.

The parties executed a written amendment to the PSA on March 3, 2017, to extend the closing date and the permitting period to allow time for resolution of certain drainage issues raised by the Town of Cumberland (the town). Specifically, the amendment extended the permitting period under Section 6.03 to April 28, 2017, and provided that the closing would take place "(i) thirty (30) days after the satisfaction of all conditions precedents set forth in the [PSA] * * * or, (ii) May 25, 2017 (Ninety (90)) days from the date agreed upon in the [PSA]."

To address the town's drainage concerns, Terrapin engaged Fuss & O'Neill, the engineering firm that had prepared the original plans for the Gold Rush Estates subdivision on behalf of the Trust. Terrapin also proposed a modification of the subdivision's plans that included additional phases of the subdivision project beyond Phase I. However, the Trust instructed Fuss & O'Neill not to cooperate with Terrapin in preparing the plans. Terrapin requested another extension of the closing date—a request that the Trust rejected.

Terrapin filed a four-count complaint in the Superior Court on May 24, 2017, the day before the closing was scheduled to take place, alleging breach of contract and breach of the implied covenant of good faith and fair dealing, and seeking

specific performance of the PSA and temporary and permanent injunctions. Terrapin alleged that by instructing Fuss & O'Neill not to prepare work product for Terrapin in connection with Phase I, the Trust frustrated Terrapin's ability to obtain the necessary permits and to close on the property in accordance with the PSA.

The Trust responded with a counterclaim that similarly alleged breach of contract and breach of the implied covenant of good faith and fair dealing, and sought a declaratory judgment that the PSA was terminated. In support of its counterclaim, the Trust asserted that, by seeking to modify plans for phases of the subdivision beyond Phase I, Terrapin demonstrated that it was "unable and/or unwilling" to perform the PSA.

Thereafter, Terrapin moved for preliminary and permanent injunctions in order to force the Trust to perform under the PSA and to prevent the Trust from "selling, transferring or otherwise encumbering" the property in a manner that ran afoul of the PSA.

In a letter dated July 12, 2017, the town indicated to Terrapin that the town would have no objection to recording Phase I of the subdivision after Terrapin posted the required bond. Terrapin and the Trust entered into a consent order entered by the Superior Court on July 21, 2017, that amended the PSA.[2] The consent order

---

[2] The consent order also continued Terrapin's motion for a preliminary and permanent injunction "until such date as set by this [c]ourt, if necessary."

- 4 -

extended the closing date to September 29, 2017, and required the parties to obtain the "necessary approvals from the Town[.]" It also required Terrapin to provide a commitment letter from its lender to the Trust by August 29, 2017, and a commitment letter from the agent issuing the performance bond by September 15, 2017.

Terrapin presented the town with a tripartite agreement between Terrapin, its lender (Needham Bank), and the town's planning department, in lieu of a performance bond; however, Terrapin did not meet the August 29, 2017 deadline for providing the Trust with a commitment letter from its lender. On August 30, 2017, counsel for the Trust contacted Terrapin's counsel regarding the outstanding commitment letter. Terrapin's counsel did not respond until September 11, 2017; Terrapin's counsel forwarded an e-mail from Needham Bank, dated August 30, 2017, that indicated that the lender would "honor its March 23, 2017 commitment for your project at Gold Rush Estates[,]" a commitment that had approved Terrapin's request for a commercial real estate loan.[3] The terms were such that Needham Bank would accept a first-priority mortgage on the property in exchange for a loan in the amount of $640,000 for the purchase of the property, a nonrevolving construction

---

[3] Apparently, the March 23, 2017 commitment was secured by Terrapin in an effort to meet the original closing date that was contemplated by the PSA. That commitment provided that Terrapin was to communicate its acceptance to Needham Bank within fourteen days. Terrapin did not share the commitment with the Trust prior to September 11, 2017.

line of credit in the amount of $760,000, and a $3 million revolving line of credit for other construction.

The parties did not close on the property by the September 29, 2017 deadline. On October 3, 2017, Terrapin requested that the Trust stipulate to an extension of the date set for closing. Although the Trust never agreed to an extension, the parties continued to negotiate.

Terrapin sent the Trust a draft subordination agreement on October 6, 2017, that contained several terms that differed from what was contemplated by the PSA. Specifically, the draft subordination agreement provided that (1) the Trust would subordinate its security interest to a debt of $1.4 million in addition to a maximum of $3 million in construction promissory notes; and (2) the Trust's security interest would be behind "any and all other indebtedness or liabilities of the Borrower to the Senior Lender[.]" The Trust objected to the draft subordination agreement.

Approximately three weeks later, Terrapin circulated a second draft of the subordination agreement to the Trust that eliminated any subordination to construction notes but still provided that the Trust's security interest would be subordinated behind $1.4 million and "any and all other indebtedness or liabilities of the Borrower to the Senior Lender[.]" Counsel for the Trust did not respond to Terrapin regarding the second draft.

On November 1, 2017, the Trust filed an objection to Terrapin's May 2017 motion for a preliminary injunction and asked the Superior Court to declare that Terrapin was in breach of the parties' agreements and that the PSA was null and void. In support of its request, the Trust asserted that the revised subordination agreement did not comply with the terms of the PSA because the revisions would have subordinated the Trust's security interest to a debt greater than it had bargained for, in violation of Section 2.02 of the PSA.

In response to the Trust's objection, Terrapin circulated a third draft subordination agreement to the Trust on November 2, 2017. The third draft subordination agreement reflected the correct subordinated amount, $1,340,000, but still included the language that the Trust's security interest would be behind "any and all other indebtedness or liabilities of the Borrower to the Senior Lender[.]"

Unable to reach an agreement with the Trust, Terrapin filed an amended complaint in the Superior Court on December 18, 2017, seeking specific performance of the PSA. Terrapin alleged that the Trust was in contempt of the consent order by failing to cooperate in obtaining the necessary approvals from the town. Terrapin further alleged that the Trust breached the PSA and the implied covenant of good faith and fair dealing by not agreeing to additional extensions, as required under Sections 4.01 and 6.03 of the PSA. In its answer, the Trust asserted several affirmative defenses, including that Terrapin failed to comply with Section

2.02 of the PSA; Terrapin was unable to close by the date specified in the amended PSA; and Terrapin failed to provide a commitment letter from its lender by the date specified in the amended PSA.

The parties filed a joint statement of undisputed facts, and a nonjury trial on Terrapin's complaint for specific performance commenced on May 31, 2018.[4] The trial justice rendered a bench decision on June 11, 2018, in which he found that Terrapin had not shown that it was able to perform under the PSA. He also found that the Trust had not unjustifiably failed to perform under the PSA and its subsequent amendments. Thus, the trial justice denied Terrapin's request for specific performance and granted the Trust's request to terminate the PSA.

The trial justice also addressed two additional issues raised by the parties. He concluded that if the tripartite agreement had been accepted by the town, such an agreement in lieu of the bond requirement would not have caused Terrapin to be in default. Finally, the trial justice found that, although the Trust "rais[ed] obstacles to the consummation of the contemplated transaction[,]" there was no evidence that the Trust continued to do so after entry of the consent order. Judgment was entered in favor of the Trust. Terrapin timely appealed.

---

[4] The scope of the bench trial was limited to the issue of specific performance. Terrapin's legal claims were reserved by agreement of the parties for subsequent adjudication by the Superior Court.

We consider whether the trial justice erred when he determined that Terrapin was not entitled to specific performance of the PSA.

**Specific Performance**

We will reverse a judgment in a nonjury case "when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *Lamarque v. Centreville Savings Bank*, 22 A.3d 1136, 1139-40 (R.I. 2011) (quoting *Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 745 (R.I. 2009)). "If, as we review the record, it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for that of the trial justice even though a contrary conclusion could have been reached." *Wellington Condominium Association v. Wellington Cove Condominium Association*, 68 A.3d 594, 599 (R.I. 2013) (brackets omitted) (quoting *Hernandez v. J.S. Pallet Co.*, 41 A.3d 978, 982 (R.I. 2012)).

Specific performance is available as a remedy for breach of a real estate agreement when "the essential contractual provisions [are] clear, definite, certain, and complete." *Keystone Properties and Development, LLC v. Campo*, 989 A.2d 961, 964 (R.I. 2010) (brackets omitted) (quoting *Fischer v. Applebaum*, 947 A.2d 248, 251-52 (R.I. 2008)). Additionally, the purchaser must establish that he or she "has at all times been ready, willing, and able to perform his or her part of an

agreement to transfer real estate[.]" *Lajayi v. Fafiyebi*, 860 A.2d 680, 688 (R.I. 2004) (quoting *Thompson v. McCann*, 762 A.2d 432, 436 (R.I. 2000)). The purchaser must also establish that the seller "unjustifiably refuse[d] or fail[ed] to perform under the agreement." *Bucklin v. Morelli*, 912 A.2d 931, 936 (R.I. 2007) (quoting *Yates v. Hill*, 761 A.2d 677, 679 (R.I. 2000)).

Terrapin claims that the trial justice made several errors in deciding that Terrapin is not entitled to specific performance in this case. First, Terrapin claims that the trial justice overlooked and ignored material evidence demonstrating that Terrapin was ready, willing, and able to consummate the PSA because, Terrapin maintains, it had "consistently worked in good faith towards closing on the Property[,]" particularly given its ongoing efforts to work with the town and Fuss & O'Neill to address drainage concerns. Second, Terrapin claims that the trial justice overlooked and ignored material evidence demonstrating that the Trust waived the right to demand strict compliance with Section 2.02 of the PSA. Third, Terrapin claims that the trial justice erroneously found that the Trust was not unjustified in its failure to consummate the PSA. In support of this argument, Terrapin highlights evidence of what it asserts is the Trust's bad-faith conduct, in breach of its duty of good faith and fair dealing—the fact that the Trust ceased communicating with Terrapin regarding the Trust's concerns about the draft subordination agreement, as well as the Trust's refusal to extend deadlines to permit recording of Phase I plans.

- 10 -

However, our examination of the record reveals that competent evidence supports the trial justice's findings. With respect to Terrapin's burden to demonstrate that it was ready, willing, and able to consummate the PSA, it is clear that the dispositive question was not whether Terrapin had made efforts to address drainage concerns, but rather whether Terrapin had met its financing obligations in compliance with Section 2.02 of the PSA.

Section 2.02 required Terrapin to execute a note and mortgage in favor of the Trust. The Trust's mortgage would be junior only to the lender's lien, which would not exceed $1,340,000. The consent order specified a deadline for Terrapin to establish that it would be able to meet its financing obligations: Terrapin was to provide a commitment letter from its lender on or before August 29, 2017, one month in advance of the parties' newly agreed-upon closing date. It was Terrapin's burden to prove that it was ready, willing, and able to comply with the financing terms, but the record indicates that Terrapin repeatedly failed to do so. Terrapin did not meet the extended deadlines under the consent order, and it did not seek a modification of the court-ordered dates through an appropriate motion. Although the Trust continued negotiations into October 2017, and considered multiple drafts of a subordination agreement, the terms of each draft failed to meet the obligations of Section 2.02. In fact, the language of the proposed subordination agreements would have required the Trust to subordinate its junior lien to *any and all indebtedness* of

Terrapin to the lender. It is therefore clear that Terrapin was not ready, willing, and able to consummate the PSA at any time prior to the November 1, 2017 court filing.

Terrapin attempts to minimize the significance of its failure to comply with Section 2.02 by claiming that the Trust waived its right to demand strict compliance with that provision. Terrapin asserts that, despite the language in the PSA that provides that the Trust would subordinate its security interest to a first-position mortgage not to exceed $1,340,000, the Trust waived its right to enforce that material provision because it failed to object to language in the first two draft subordination agreements that subordinated the Trust's security interest to "any and all other indebtedness or liabilities of the Borrower to the Senior Lender[.]"

Fatal to Terrapin's argument, however, is that "[t]his Court continually has affirmed that we 'will not review issues that are raised for the first time on appeal.'" *Tyre v. Swain*, 946 A.2d 1189, 1199 (R.I. 2008) (quoting *Richard v. Richard*, 900 A.2d 1170, 1178 (R.I. 2006)). "Our well settled raise-or-waive rule prevents us from addressing arguments not raised before the trial justice." *Id.* (quoting *Richard*, 900 A.2d at 1178). It is clear from our review of the record that Terrapin did not raise this argument in the Superior Court; as such, the trial justice did not have the opportunity to rule on the issue. It is notable that Terrapin did not press the issue of waiver in its pretrial filings or at the hearing on its claim for specific performance: The Trust asserted in numerous filings its entitlement to termination of the PSA

- 12 -

because Terrapin failed to comply with Section 2.02 of the PSA. Accordingly, we do not consider whether the Trust waived its right to demand strict compliance with the terms of the PSA.

Although we conclude that Terrapin's failure to comply with Section 2.02 of the PSA is dispositive of whether Terrapin is entitled to specific performance of the PSA, we nevertheless address Terrapin's final claim: that the trial justice erroneously found that the Trust was not unjustified in its failure to consummate the agreement. Terrapin argues that the trial justice overlooked the following alleged bad-faith conduct by the Trust: (1) ceasing to communicate with Terrapin regarding concerns about the draft subordination agreement and (2) refusing to extend deadlines to permit recording of Phase I plans, in violation of Section 6.03 of the PSA.

Terrapin asserts that the Trust's failure to communicate its concerns prevented Terrapin from complying with Section 2.02. According to Terrapin, had the Trust communicated its concerns, Terrapin would have raised them with the lender and, according to Terrapin, "it is reasonable to conclude that Needham Bank, (who had been more than willing to concede to the Trust's other modification demands), would have removed that language."

Our examination of the record reveals that there is no direct evidence that the lender would have agreed to this request, and it is clear that the trial justice did not

draw this inference. His failure to do so was not clearly wrong, and we decline to reach a contrary conclusion.

Terrapin's argument concerning the Trust's refusal to extend deadlines to permit recording of Phase I plans is similarly unavailing. The record demonstrates that the town notified Terrapin on July 12, 2017, that once Terrapin satisfied the bond requirements, the town would have no objection to the recording of Phase I plans. The parties entered into a consent order to revise deadlines, and, by the end of August, Terrapin negotiated a tripartite agreement that satisfied the bond requirement. However, as discussed previously, Terrapin did not seek a modification of the court-ordered dates through an appropriate motion.

Accordingly, as Terrapin has not demonstrated that the trial justice "misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong[,]" *Lamarque*, 22 A.3d at 1139-40 (quoting *Cathay Cathay, Inc.*, 962 A.2d at 745), we must deny its appeal.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court, and remand the papers in this case to the Superior Court.

- 14 -



STATE OF RHODE ISLAND

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Terrapin Development, LLC v. Irene M. O'Malley Revocable Trust et al. |
| **Case Number** | No. 2018-346-Appeal. (PC 17-2417) |
| **Date Opinion Filed** | June 30, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Michael A. Silverstein |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Michael A. Kelly, Esq. <br> Randall L. Souza, Esq. <br> Nicole J. Martucci Esq. |
| | For Defendants: <br><br> Barry J. Kusinitz, Esq. <br> Joseph Raheb, Esq. |